Jodi DiRAIMO et al.

v.

CITY OF PROVIDENCE et al.

No. 96–16–Appeal.

Supreme Court of Rhode Island.

May 19, 1998.

Kevin McHugh, Providence, for Plaintiff.

Kris Macaruso Marotti, Warwick, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This case requires us to determine the constitutionality of a zoning ordinance enact-

ed by the city of Providence (city) restricting the presentation of adult entertainment in the downtown Providence area.

The wellspring of this particular dispute lies in two watershed events. First, in 1991, after eight years of review and study of existing city-zoning ordinances, the city enacted comprehensive zoning legislation that included, among other things, provisions governing adult-entertainment activity in Providence.[1] The particular zoning provisions at issue here were later amended in 1994.[2] Second, on May 26, 1993, the Providence Board of Licenses (board) found that The Satin Doll, an exotic dancing establishment doing business in downtown Providence since March 1993, was in violation of the city's adult-entertainment ordinance because (1) the dancers' activities there constituted adult entertainment within the meaning of the ordinance and (2) The Satin Doll was doing business in the city's D–1 zone (Providence's downtown central business district), where adult entertainment was prohibited. Accord-

ingly the board ruled that The Satin Doll's entertainment license should be revoked.

The board's ruling precipitated the June 4, 1993 filing of a complaint for declaratory and injunctive relief against the city by two individuals doing business as The Satin Doll, Jodi DiRaimo and the owner, Richard Shappy (collectively plaintiffs or the Satin Doll plaintiffs). The board's decision was stayed pending resolution of the matter. After a trial on the merits held in the Superior Court on various dates throughout July, October, and November 1995, the trial justice entered judgment for the city, awarded costs and reasonable attorneys' fees to the city, and lifted all restraining orders previously in effect.[3]

■ On appeal the Satin Doll plaintiffs contend that the trial court erred in finding section 1000.3 of the city's zoning ordinance to be constitutional and that the court abused its discretion in awarding costs and attorneys' fees to the city. With respect to those constitutional issues preserved for appeal,[4]

1. Section 1000.3 of the Providence zoning ordinance was adopted on October 17, 1991 and defined adult entertainment as follows: "Any commercial establishment or business where any individual, employee, operator or owner exposes human genitals, pubic regions, buttocks, anus, or female breasts below a point immediately above the tops of the areolae for viewing by patrons." Such activity was permissible only greater than 200 feet from any residential zone and had to be in one of four designated areas: M–1 or M–2, which were manufacturing zones, or with special exception, C–4 or D–2, which were heavy commercial zones with a mixture of downtown businesses and manufacturing operations. ·

2. The city amended its 1991 zoning ordinance, effective June 27, 1994, and revised the definition of adult entertainment to read as follows: "Any commercial establishment or business where any individual, employee, operator or owner works or performs in the nude. Nudity means the showing of male or female genitals, pubic area, or buttocks with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple and below, or the showing of the covered male genitals in a discernibly turgid state. Adult entertainment shall also be construed to mean actual or simulated acts of sexual activity by clothed or nude individuals and includes both 'live' exposure and film, video, or any type of reproduction of such human anatomy and sexual activity." the amendment further lim-

ited adult entertainment to the M–1 and M–2 zones, provided that such use was located more than 200 feet from a residential zone.

3. Although not a formally consolidated action, this case was heard in the Superior Court in tandem with a similar action brought against the city and the board on July 27, 1995, after the board denied a different business's request for an entertainment license for a "go-go dancing" establishment in Providence's D–1 zone (the Sportsman's Inn case). The Sportsman's Inn plaintiff alleged almost identical constitutional infirmities against the city's adult-entertainment ordinance as did the Satin Doll plaintiffs. Although the Superior Court judge entered judgment against both the Satin Doll plaintiffs and the Sportsman's Inn plaintiff, the Satin Doll plaintiffs are the only appellants before this Court.

4. At trial, plaintiffs raised three distinct constitutional issues: (1) that section 1000.3 violated the due-process clauses of the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution because the city, in enacting the ordinance, relied on insufficient evidence of any deleterious secondary effects of live adult entertainment on the D–1 area, (2) that section 1000.3 violated the free-speech clauses of the First Amendment to the United States Constitution (as applied to Rhode Island by the Fourteenth Amendment) and article 1, section 21, of the Rhode Island

we review the Superior Court's evaluation of the ordinance for errors of law. *See Sullivan v. Chafee*, 703 A.2d 748, 751 (R.I.1997) (review to determine whether Superior Court misinterpreted applicable law).

With the exception of the attorneys' fee award to the city, we concur with the well-reasoned constitutional analysis set forth in the trial justice's opinion. Accordingly we adopt it as our own, affirm the judgment below, and annex hereto the relevant sections of his opinion, excising only those portions concerning the Sportsman's Inn case and those parts discussing plaintiffs' contention that the adult-entertainment ordinance is unconstitutional because it violates equal-protection principles. *See* Appendix A to this opinion. However, we supplement the Superior Court's opinion (by the addition of a footnote therein) to address Rhode Island's own independent standard for determining the constitutionality of zoning restrictions on adult-entertainment businesses. *See State v. Bertram*, 591 A.2d 14, 21 (R.I.1991) (Rhode Island Constitution may afford greater protection to its citizens under its own constitutional provisions than that provided under similar provisions of the United States Constitution).[5]

■ However, with respect to that portion of the Superior Court's judgment that awarded reasonable attorneys' fees to the city, we disagree that such an award was proper in this case and, therefore, we reverse with respect to that portion of the decision. Although we recognize that a trial justice has the authority to make an award of costs to a prevailing party, *see* G.L.1956 § 9–22–5 ("[i]n civil actions at law, the party prevailing shall recover costs, except where otherwise specially provided, or as justice may require, in the discretion of the court"); Super.R.Civ.P. 54(d) ("[c]osts * * * shall be allowed as of course to the prevailing party as provided by statute and by these rules unless the court otherwise specifically directs"), such an award for costs should not include attorneys' fees unless such an award is authorized by a separate statute, rule, or other law, and any such award is subject to review for abuse of discretion. *Hartman v. Carter*, 121 R.I. 1, 4, 393 A.2d 1102, 1104 (1978). "[D]iscretion is not exercised by merely granting or denying a party's request." *Id.* at 4–5, 393 A.2d at 1105. Rather the actions of a trial justice must be taken "in the light of reason as applied to all the facts and with a view to the rights of all the parties to the action while having regard for what is right and equitable under the circumstances and the law." *Id.* at 5, 393 A.2d at 1105.

■ Pursuant to 42 U.S.C. § 1988, an award of attorneys' fees to a prevailing party defendant in a civil rights suit is appropriate only upon a finding that a plaintiff's action was frivolous, unreasonable, or without foundation. *See, e.g., Andrade v. Jamestown Housing Authority*, 82 F.3d 1179, 1192 (1st Cir.1996). But a defendant is not entitled to attorneys' fees under 42 U.S.C. § 1988 merely because he or she prevailed on the merits of the lawsuit. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1058 n. 2 (9th Cir.1995). Because the trial justice failed to make any

Constitution because it was overbroad in sweeping protected activity within its ambit, and (3) that section 1000.3 violated the equal-protection clauses of the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution because it prohibited display of the female breast in the D–1 zone. but placed no such restriction on the display of the male breast. However, the Satin Doll plaintiffs have waived this equal-protection issue by failing to raise it on appeal.

5. Several other state courts have had occasion to consider their own constitutional mandates apart from the federal requirements first outlined in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality), and later defined in the seminal opinion *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). *See, e.g., People v. Superior Court (Lucero)*, 49 Cal.3d 14, 259 Cal.Rptr. 740, 774 P.2d 769, 776–77 (1989) (adding a constitutional level of "use" requirement); *Town of Islip v. Caviglia*, 73 N.Y.2d 544, 542 N.Y.S.2d 139, 540 N.E.2d 215, 221 (1989) (adopting a balancing approach examining whether the governmental interest to be achieved outweighs the resulting interference with free expression); *City of Portland v. Tidyman*, 306 Or. 174, 759 P.2d 242, 249–51 (1988) (requiring that a city enforcing a regulation placing restrictions on adult businesses demonstrate "the reality of the threatening effect at the place and time" of application and suggesting that the law's text specify the adverse effects attributable to the adult activity).

finding whatsoever that the plaintiffs' lawsuit here was indeed frivolous, unreasonable, or without foundation—and we can discern no basis for such a finding in this case—we conclude that he erred in awarding attorneys' fees and, therefore, we vacate that portion of the lower court's judgment.

## Conclusion

For these reasons and those set forth in the annexed decision of the Superior Court, we deny the appeal in part and sustain the appeal in part. Specifically, we affirm that portion of the judgment in favor of the city with respect to the constitutionality of the city's adult-entertainment ordinance but vacate that part of the judgment awarding reasonable attorneys' fees to the city. The papers shall be remanded so that an amended judgment can be entered consistent with this opinion.

## APPENDIX A

### STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC.

SUPERIOR COURT

JODI DiRAIMO, et al., Plaintiffs,

v.

CITY OF PROVIDENCE, et al., Defendants.

C.A. No. PC 93–2957

SPORTSMAN'S INN, INC., Plaintiff,

v.

CITY OF PROVIDENCE, at al., Defendants.

C.A. No. PC 95–4083

### DECISION

ISRAEL, J.

These two cases present substantially similar challenges to the constitutionality of the City of Providence's zoning of adult entertainment.

### THE SATIN DOLL CASE

Jodi DiRaimo and Richard Shappy, doing business as The Satin Doll, brought an action in this court on June 4, 1993, against the City of Providence and the members of the City's Board of Licenses. They alleged that the Director of the City's Department of Inspection and Standards visited their place of business on April 21, 1993. He reported to the City's Board of Licenses that he observed an employee of The Satin Doll expose "her breasts below a point immediately above the tops of the areolae," and that she totally exposed her buttocks. As a consequence, after hearing, on May 26, 1993, the Board concluded that the plaintiffs were in violation of the provisions of the zoning ordinance then in effect pertaining to adult entertainment and revoked the plaintiffs' entertainment license. That revocation was stayed to enable the plaintiffs to bring this action.

The following provision of the 1991 zoning ordinance was applied to the plaintiffs' activity.

"1000.3—Adult Entertainment: Any commercial establishment or business where any individual, employee or operator or owner exposes human genitals, pubic regions, buttocks, anus, or female breasts below a point immediately above the tops of the areolae for viewing by patrons."

The Satin Doll is located in a district zoned D–1 Downtown Central Business District (hereinafter simply the "D–1 zone"), which is described as follows in Section 101.3 of the 1991 zoning ordinance:

"This zone is intended to encourage revitalization and restoration of the historic core business area and to accommodate appropriate expansion of the downtown area. A variety of business, financial, institutional, public, quasi-public, cultural, residential, and other related uses are encouraged in the downtown area. Compatible and appropriate mixed uses are encouraged to promote commercial, retail and other business activity at street levels; residential, retail, and office uses on the upper floors; and to preserve and foster the economic vitality of the downtown.

This zone is for application in the downtown core."

According to Chart 3.0 of the permitted, limited and prohibited uses under that ordinance, adult entertainment is prohibited in a D–1 zone. Adult entertainment was, however, permitted as a special exception in C–4 and D–2 zones, and, without exception, in M–1 and M–2 zones, but in any case more than 200 feet from an R (residential) zone. The *D–2 Downtown: Mill District* zone is described as follows in the ordinance:

"This zone is intended to foster expansion of the downtown uses into former manufacturing areas in which commercial, retail, residential, and office uses are being introduced. A variety of business, financial, institutional, public, quasi-public, cultural, residential, light manufacturing and other related uses are encouraged to provide the mix of activities necessary to accommodate the growth of Downtown Providence."

The plaintiffs alleged (1) that Section 1000.3 violated the "due process" clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Constitution of this State, because the City "did not rely on any relevant and probative evidence whatsoever regarding the conduct described in Section 1000.3 pertaining to the effect of that conduct on other uses permitted in the zone and/or the compatibility of the proscribed conduct with other uses allowed in the zone"; (2) violated the First and Fourteenth Amendments to the U.S. Constitution and Article I, Section 21 of the State Constitution, because of over-breadth and because it barred the display of uncovered parts of the human body during dance and theatrical performances without any showing that such display is obscene, a disturbance of the peace or even sexually explicit; and (3) violated the equal protection clauses of the Fourteenth Amendment to the U.S. Constitution and Article I, Section 2 of the Constitution of this State, because it proscribes the exposure of portions of female breasts but not of male breasts. Finally, the plaintiffs assented that they are entitled to relief under 42 U.S.C. § 1983, including attorneys fees pursuant to 42 U.S.C. § 1988.

On June 8, 1993, the Board's order was stayed by the Court pending hearing on the plaintiffs' application for preliminary injunction. On June 24, 1993 the defendants moved to dismiss the plaintiffs' complaint for lack of subject matter jurisdiction under Rule 12(b)(1) R.Civ.Proc. The defendants argued that the plaintiffs' complaint was essentially a request for judicial review of a licensing decision of a municipal agency. In the absence of a statutory right of appeal, they argued, the only access to judicial review is by application to the Supreme Court for a common law writ of certiorari. *Phelps v. Bay St. Realty Corp.,* 425 A.2d 1236, 1239 (R.I.1981). They also argued that the plaintiffs had failed to comply with G.L.1956 (1991 Reenactment) § 45–15–5 by filing a claim with the City Council. Later on, on June 15, 1993, the defendants argued that the plaintiffs had failed to exhaust their administrative remedies when they applied for and withdrew an application for a variance from the zoning board of review, citing *Nardi v. City of Providence,* 89 R.I. 437, 153 A.2d 136 (1959). The plaintiffs countered that this Court had plenary jurisdiction under §§ 9–30–1 et seq. to declare the rights of the parties and to enjoin the enforcement of an unconstitutional ordinance, relying in part on *Taylor v. Marshall,* 119 R.I. 171, 180–81, 376 A.2d 712, 716–17 (1977). They met the exhaustion of remedies argument by reference to *Annicelli v. Town of South Kingstown,* 463 A.2d 133, 137–38 (R.I.1983), pointing out that they were challenging the constitutionality of § 1000.3 of the zoning ordinance on its face. On June 30, 1993 the defendants moved for an *in limine* ruling that plaintiffs were required to prove unconstitutionality beyond a reasonable doubt, citing *Newport Auto Salvage, Inc. v. Town Council,* 502 A.2d 339, 343 (R.I.1985).

Hearing on the plaintiffs' motion for preliminary injunction and the defendants' motion to dismiss was continued from time to time during 1993, 1994 and 1995.

After hearing argument on June 23, 1995 and upon consideration of the memoranda of the parties the defendants' motion to dismiss for lack of subject matter jurisdiction was denied. The matter was thereupon contin-

ued for hearing on its merits. The defendants filed their answer to the complaint on July 28, 1995. The Court reserved ruling on the issue of the pertinent burden of proof pending its decision on the merits.

\* \* \*

### THE "LEGISLATIVE HISTORY"

The 1991 zoning ordinance originated in the work of a mayoral Zoning Commission created in 1983 with a varying membership during the years of its existence. By 1989 the chair of the Commission was filled by the chair of the City Council's Ordinance Committee. In addition, one other member of the Council was a member of the Commission until the 1990 elections. The Planning Division of the City Department of Planning and Development provided professional staff to the Commission. The Commission held public meetings in the offices of the planning division. Several public meetings were also eventually held in various locations around the city when drafts were in a final form to be presented for public comments. Public hearings, as distinguished from meetings, were held by the Council Committee on Ordinances in the Council chambers.

The process for drafting the 1991 ordinance followed a general pattern. An expert would prepare a first draft of a portion of the ordinance. That draft would be circulated among the members of the Commission. Revisions would be made by the staff after discussion and revised drafts would be circulated until a final draft was approved by the Commission. Then, zoning maps were prepared by the staff and approved by the Commission. Eventually, a public hearing, as required by law, was held in March or April 1991 by the Ordinance Committee of the City Council. The ordinance was finally adopted by the City Council on October 17, 1991.

The question of adult entertainment was raised at one of the Commission's public meetings, probably in 1989, before the use schedule in the zoning ordinance had been prepared. The staff was instructed by the Commission to collect information on the regulation of adult entertainment. It turned to the planning advisory service of the American Planning Association, which seems to be a clearing house of research material for members of the association. The professional staff reviewed the material it received from the service, which included these documents:

(1) *Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Business,* June 6, 1989, Hubert H. Humphrey, III, Attorney General, State of Minnesota.

(2) *Regulation of Adult Entertainment Establishments in New Hanover County* (North Carolina), New Hanover County Planning Department, July 1989.

(3) *Adult Entertainment Business Study for Manatee County* (Florida), Prepared by: Manatee County Planning and Development Department, June 1987.

(4) *Adult Entertainment Businesses in Indianapolis, An Analysis,* (Indiana), Indianapolis Division of Planning 1984.

The Minnesota report contains a review of studies conducted in Minneapolis, St. Paul, and other cities throughout the country, which provided "compelling evidence that sexually oriented businesses are associated with high crime rates and depression of property values." The Manatee County, Florida, study reported: "Research from over fifteen cities and counties throughout the country, conducted between 1977 and 1987, indicates that adult entertainment businesses do have a negative effect upon property value, particularly residential." Further, it was noted "that areas with adult entertainment businesses tend to have higher crime rates than areas without such uses." This study summarized findings from assessments of the impact of adult entertainment businesses in Austin, Texas (1986); Indianapolis, Indiana (1984) (the same study as considered by the Commission's staff and in the Minnesota Attorney General's report); Los Angeles, California (1977); Phoenix, Arizona (1979); St. Paul, Minnesota (1978) (the same study as referred to in the Minnesota Attorney General's report); and, briefly, Amarillo and Beaumont, Texas. The New Hanover

County, North Carolina, report referenced the Los Angeles, California (1977); Detroit, Michigan (1972); Beaumont, Texas; and, again, the Indianapolis, Indiana (1983) studies for a decline in real estate values in the neighborhood of adult entertainment businesses. The report also concludes that: "There is much evidence to support the assertion that concentrations of adult businesses often result (sic) in an increase of crime, particularly prostitution, drugs, assault and sex crimes." (Citing the Phoenix study.)

The Indiana analysis is a meticulous and carefully documented study of the effects of adult entertainment business. The analysis conservatively concludes:

"While the statistics assembled and analyzed in this study should not be construed as proving that adult businesses cause the negative impacts illuminated herein, an obvious variable in each instance of comparison is their presence. Crime rates—particularly those that are sex-related show substantial deviation from normal rates for this population. Analyses of real estate listings and sales show a negatively abnormal performance of the real estate market in areas where adult entertainment is offered. In this latter case, the best professional judgment available indicates overwhelmingly that adult entertainment businesses—even a relatively passive use such as an adult bookstore—have a serious negative effect on their immediate environs."

In addition, the staff had available to it two ordinances of Palm Beach County, Florida: Ordinance No. 88–31 (An adult entertainment Code) and No. 88–32 (An amendment to the zoning code regarding adult entertainment establishments). Each of these ordinances contains extensive findings regarding secondary effects of the operation of adult entertainment establishments.

Based on a survey of this research data, Mrs. Elisa Silverstein Heath, an assistant city planner, dispatched a memo on February 20, 1990, to Mr. Thomas E. Deller, then associate director of planning and a staff resource to the Commission, regarding adult entertainment. In her memo she observed:

"Other communities (than Boston) which have studied regulating AEB's (adult entertainment businesses) have determined that a number of negative impacts occur when such uses are concentrated (as in Boston) in one area. Such impacts include increases in crime and therefore, in police enforcement, decreases in property values, increases in office building vacancy rates, and increases in the number of liquor licenses."

She recommended that adult entertainment businesses should be regulated by "adopting zoning which requires the spacing out of such establishments." Her memo was made available to the Commission.

According to Mr. Deller, that memo and the research material was reviewed and worked on by a drafting sub-committee of the Commission made up of himself, Ms. Heath, Mr. Merlin DeConti, then Director of Inspection and Standards, and Mr. Andrew Teitz, a *pro bono* attorney advising the Commission, and "the overall discussion was taken to the full committee in preparing the language in the ordinance." He testified further on deposition:

"We determined that it was—adult entertainment was a business or an entertainment we wanted to regulate to certain areas of the city that we felt that it could have a negative effect in those areas of the city that we were trying to revitalize and improve, and as a result, we wanted to limit it to particular areas."

He also testified that the decision to limit the locations of adult entertainment in the draft ordinance was based on the studies reported in the research material. The drafting sub-committee came to the following conclusion:

"We felt that it was something that we wanted to control and regulate in the city so that it would not have some of the negative impacts that we were concerned about in areas we were trying to revitalize. We didn't want to have it—we made a decision it was a use that we did not want in our residential zones, trying to protect our neighborhoods. And as a result, certain commercial zones fell out, C1 and C2,

because they were interspersed and surrounded by neighborhood zones. And we didn't want that type of use involved in an area, hopefully a strong neighborhood area. Actually what we did is we looked at the existing adult entertainment uses in the city at the time and looked at their location, the M1 zone, the industrial zone was probably the best category for them. There were some located in areas that were proposed to be C4 or were C4 and that probably would allow it there, but allow it as a special exception because we didn't necessarily want to see it expand there by right without having at least some public review."

According to Mr. Deller, that conclusion was communicated to the full Commission and was eventually included in the use table as submitted by the Commission to the City Council for adoption.

Apparently, from the record, the only time any question about adult entertainment zoning was raised by public comment occurred at a public meeting of the commission at Mount Pleasant High School on July 16, 1990. By that time the drafting process by the Commission had reached a stage where proposed zoning maps and use tables were prepared for public comment. One citizen has testified that at that meeting he commented that he objected to adult entertainment establishments being allowed in residential areas or commercial areas or industrial areas that abut residential areas. This citizen explained at hearing before the Court that his objection was based on morals and taste. On August 2, 1990, following the meeting, another citizen wrote to Mr. Deller about the comments at the July 16 meeting. He suggested that use item "Adult Entertainment" be permitted in M–1 and M–2 zones only as a special exception, so that residential neighbors abutting manufacturing zones would have an opportunity to be heard before adult entertainment establishments open across from them. As finally adopted, the ordinance contained a footnote to "Adult Entertainment" permitting it only, "Provided that such uses are located more than 200 feet from an R zone."

As finally adopted, the 1991 ordinance permitted adult entertainment, as defined, without exception, in approximately three of the approximately twenty square miles occupied by the city. In addition, such a use was permitted as a special exception in .95 square miles. Altogether, adult entertainment was permitted by the ordinance in approximately twenty percent of the area of the city.

On June 17, 1991, the General Assembly enacted *P.L.1991, ch. 307*, to add *§§ 45–24–27 thru 45–24–72*, known as "the Rhode Island Zoning Enabling Act of 1991," to the General Laws. That Act required that all Rhode Island municipalities bring their zoning ordinances into conformance with the Act by July 1, 1993. All municipal zoning ordinances were to be developed and maintained in accordance with a comprehensive plan prepared, adopted and as may be amended in accordance with *Chapter 45–22.2* of the General Laws. By further amendment the time for bringing zoning ordinances into conformance with comprehensive plans was extended to December 31, 1994. A draft comprehensive plan entitled *"Providence 2000: The Comprehensive Plan"* went out to public comment in 1992. As revised in July 1993, it was submitted by the City Plan Commission to the City Council in October 1993, where it was finally adopted around April 1994. It therefore became necessary for the City to revise its zoning ordinance to conform to the comprehensive plan.

Under the circumstances a revised ordinance was developed by the City Planning Commission for introduction to the City Council in 1994. No new studies were done and no new information developed regarding adult entertainment between 1991 and 1994. The City planning staff provided staff support to the City Planning Commission. The staff and the Commission relied on the earlier studies which underlay the 1991 ordinance regarding adult entertainment. Two substantial changes were made in the 1994 ordinance. The definition of adult entertainment was expanded to read as previously quoted. Adult entertainment was strictly limited to M–1 and M–2 zones, provided that such uses were located more than 200 feet from an R zone.

For the expanded definition of adult entertainment the Commission relied on the advice of an assistant city solicitor derived from the case of *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

The 1993 comprehensive plan set as one of the policies for citywide planning:

"Preserve the character of Providence by protecting neighborhoods from: inappropriately scaled developments; ensuring low to medium density residential areas; and, inappropriate uses in residential and commercial areas, such as adult entertainment, by limiting their location."

For the Providence downtown area the following policy was adopted:

"Develop a 'Downtown District' as part of the zoning ordinance which recognizes: the existing building stock and development pattern; the mix of uses desired; and, the need to promote orderly growth and revitalization. The District will:

Permit a variety of uses (business, financial, institutional, public, quasi-public, cultural, residential and other related uses) that will encourage people to live, work and recreate downtown while limiting inappropriate uses, such as adult entertainment, that will detract from the desired environment."

The 1994 ordinance, accordingly, deletes any permitted special use for adult entertainment in any downtown or commercial zone. All adult entertainment businesses now lawfully operating in those zones do so as pre-existing non-conforming uses. There are at least two adult entertainment businesses currently operating in M–1 or M–2 zones.

None of the four studies or the Palm Beach County ordinances relied on by the staff in drafting the 1991 or the 1994 ordinances was made part of any record of the Zoning Ordinance Commission in 1990 or the City Planning Commission in 1994, nor by the City Council on either occasion. They were, however, part of the planning file maintained by Mr. Deller.

There is some evidence in the record that Trinity Repertory Company and Providence Performing Arts Center have on occasion presented plays or shows with total frontal nudity. Both of these theaters are located in the same D–1 zone as both plaintiffs.

### SEX AND THE FIRST AMENDMENT

The parties agree that one issue before the Court is whether § 1000.3, and § 1000.8, as applied to these plaintiffs by the City's zoning ordinance, is a constitutionally permissible regulation of expression protected by the First Amendment. Since no claim is made that the entertainment is obscene, the test is that mandated by the United States Supreme Court in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, reh. den. 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986). Since the zoning ordinance does not bar adult entertainment altogether it is properly analyzed as a form of time, place, and manner regulation. *Id.,* at 46, 106 S.Ct., at 928, 89 L.Ed.2d, at 37. "Content neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. *Id.,* at 47, 106 S.Ct., at 928, 89 L.Ed.2d, at 37.

Zoning of adult entertainment will be "content neutral" if the predominate concerns of the City Council were with the secondary effects of adult entertainment and not with the content of the entertainment itself. *Id.,* at 47, 106 S.Ct., at 929, 89 L.Ed.2d, at 37–38. In determining whether there are undesirable "secondary effects" of adult entertainment the City Council "was not required 'to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" *Id.,* at 51–52, 106 S.Ct., at 931, 89 L.Ed.2d at 40.

The plaintiffs argue that the Providence City Council did not itself have before it, nor did it consider any evidence of "secondary effects" of adult entertainment when it adopted the 1991 and 1994 general revisions of the city's zoning ordinance. In 1991 the Council relied on the recommendation of a

commission which had spent many months, if not years, in the research and drafting of a completely new zoning ordinance, of which the zoning of adult entertainment was a small part. The Commission, on the other hand, did have before it the extensive research material gathered by its drafting subcommittee regarding the survey data gathered in several communities regarding the deleterious social and economic effects of adult entertainment to the quality of life where such entertainment is located. In 1994 the definition of 'adult entertainment' was enlarged to include the definition of 'nudity' as included in a public indecency statute approved by the United States Supreme Court in *Barnes v. Glen Theatre, Inc., supra.* In addition, the area of the City in which adult entertainment was permitted was somewhat compressed. No new evidence was considered as to "secondary effects." Nor was there any reason shown why the earlier studies did not continue to be valid and reliable.

■ After a careful review of the evidence presented at the hearing, this Court finds as a fact that the City Council adopted both the 1991 and the 1994 ordinance in reliance on the studies researched by the City's planning staff in 1990. The Court finds that the concern of the planning staff that adult entertainment establishments would lead to increases in crime and decreases in property values in their neighborhood was the basis for limiting the location of those businesses to manufacturing and to some commercial districts in 1991 and to manufacturing districts only in 1994. Accordingly, the Court finds that, as in *City of Renton, supra,* the predominate intent of the City Council was unrelated to the suppression of free expression. These zoning provisions were plainly designed to reduce crime, encourage revitalization of a decaying downtown zone, maintain property values, and to preserve the quality of urban life, and not to eliminate opportunities to whatever expression is communicated by nude dancing. Based on those findings, it is evident that both ordinances were designed to serve a substantial governmental interest.

■ Finally, on this point, the plaintiffs argue that these ordinances do not allow for reasonable alternative avenues for communication. The evidence reveals that the 1991 ordinance permitted adult entertainment in 3.95 square miles out of a total of approximately twenty square miles of the City's geographic area. This nearly 20 percent of the City's area compares favorably with the mere "more than five percent" approved in *City of Renton,* 475 U.S., at 53, 106 S.Ct., at 932, 89 L.Ed.2d, at 41. The changes in the 1994 ordinance did somewhat compress the available area in which adult entertainment businesses could carry on their activities. The greatest part of three square miles of industrial zones in the City remains available for adult entertainment. The record shows that there are some apparently flourishing adult entertainment businesses operating in the zones in which such businesses are currently permitted. Others continue to operate as pre-existing non-conforming uses in areas in which the activity was once permitted.·

■ The plaintiffs argue, nevertheless, that they have made substantial investments in their places of business and will be made to suffer substantial economic loss if they are not permitted to present nude dancing. They also argue that they cannot operate profitably in the areas in which their kind of exotic dancing is permitted. The plaintiffs do not, however, contend that they are deprived of all economically feasible use of their property. As a result they are not entitled to a variance, nor can they claim that they have been deprived of their property without due process of law. As to their argument that the areas left available for permitted use for adult entertainment businesses are economically unsuitable, the observation of the United States Supreme Court in *City of Renton, supra,* regarding price is pertinent:

"That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have "the effect of suppressing, or greatly restricting ac-

cess to, lawful speech," American Mini Theatres, 427 U.S., at 71, n. 35, 96 S.Ct. 2440, 49 L.Ed.2d 310 (plurality opinion), we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. See id., at 78, 96 S.Ct. 2440, 49 L.Ed.2d 310 (Powell, J. concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact"). In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement."

*Id.,* at 54, 106 S.Ct., at 932, 89 L.Ed.2d, at 42.*

### THE OVERBREADTH ARGUMENT

▆ The plaintiffs argue that the ordinances are overbroad. They assert that the ordinances, if literally enforced, would bar the presentation of some performances by Trinity Repertory Company (Trinity) or in the Providence Performing Art Center (PPAC) which may involve the exposed nudity of a performer. Since no evidence was presented to the Commission or the City Council that these performances had the undesirable "secondary effects," which led to the zoning limitation applicable to sexually oriented adult entertainment, the ordinances would thereby reach into expression entitled to more than the barest of minimal protection under standard First Amendment analysis.

They rely on cases like *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129 (6th Cir.1994) which have held that public indecency statues that bar all public nudity violate the First Amendment when applied to "live performances with serious literary, artistic or political value." *Id.* at 136.

Because of the importance of the resolution of this issue to the overall question of the reach of the pertinent zoning ordinances, extended quotation from *Triplett Grille, supra,* is appropriate:

"Because the City has failed to demonstrate a link between nudity in non-adult entertainment and secondary effects, we do agree with the district court that the Akron ordinance must be struck down as facially unconstitutional under the First Amendment overbreadth doctrine. As this court has recognized, the "overbreadth doctrine constitutes an exception to traditional rules of standing and is applicable only in First Amendment cases in order to ensure that an overbroad statute does not act to 'chill' the exercise of rights guaranteed protection." *Leonardson v. City of East Lansing,* 896 F.2d 190, 195 (6th Cir. 1990) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)). Under the doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.' " *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (quoting *Brockett v.*

---

* We hold that when the guarantee of free speech in article 1, section 21 of the Rhode Island Constitution is implicated by an adult-entertainment ordinance which is content-neutral and allows for reasonable alternative venues for such adult entertainment, the government has the further burden of proving that the adult-entertainment activity regulated by the ordinance is a regular and substantial part of a business's course of conduct. *Cf. People v. Superior Court (Lucero),* 49 Cal.3d 14, 259 Cal.Rptr. 740, 774 P.2d 769, 776–77 (1989) (adopting "regular and substantial course of conduct" standard). We believe this additional state constitutional requirement will

insure that such a zoning regulation is narrowly tailored to support the asserted purpose of the ordinance and to affect only those categories of activity shown to produce unwanted secondary effects and not to bring within its purview other legitimate forms of expression characterized by only occasional or incidental adult-entertainment activity. In the case at bar, we conclude that the "regular and substantial course of conduct" standard is satisfied in light of the zoning legislation's "use" provision, which effectively applies section 1000.3 only to businesses whose principal, and not incidental or accessory, use of the land is adult-entertainment activity.

*Spokane Arcades, Inc.,* 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)). While the overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort," *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973), a plaintiff may prevail on a facial attack by demonstrating there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)."

The Akron public indecency ordinance at issue here prohibits all public nudity, including live performances with serious literary, artistic, or political value. The ordinance makes no attempt to regulate only those expressive activities associated with harmful secondary effects and includes no limiting provisions. Instead, Akron's wide ban on public nudity sweeps within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes. As Justice Souter acknowledged in *Barnes:*

> It is difficult to see, for example, how the enforcement of Indiana's statute against nudity in a production of "Hair" or "Equus" somewhere other than an "adult" theater would further the State's interest in avoiding harmful secondary effects, in the absence of evidence that expressive nudity outside the context of Renton-type adult entertainment was correlated with such secondary effects.

*Barnes,* 501 U.S. at 585 n. 2, 111 S.Ct. at 2470 n. 2.[3] Because the City failed to present evidence linking expressive nudity in "high-culture" entertainment to harmful secondary effects, we conclude that the ordinance infringes speech protected by the First Amendment.

While loath to find that the Akron public indecency ordinance violates the First Amendment, this Court is unable to supply a limiting construction for the regulation. It is well recognized that federal "courts do not rewrite statutes to create constitu-

tionality." *Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991). As this Court recently emphasized:

> A federal court must always be aware of the federalism concerns that arise whenever it deals with state statutes. 'The principles of federalism forbid a federal appellate court to arrogate the power to rewrite a municipal ordinance.'

*Id.* at 1125 (citation omitted). It would therefore be improper for this Court to supply limiting language for Akron's public indecency ordinance in order to preserve its constitutionality."

---

3. As noted earlier, the Supreme Court did not confront a First Amendment overbreadth challenge in *Barnes* because the Indiana Supreme Court supplied a limiting construction for the particular statute at issue. *See Glen Theatre, Inc.,* 802 F.2d at 289–90 (concluding that "Indiana Supreme Court adequately narrowed the statute"). *Id.* at 135–36.

The City argues, first, that the zoning ordinances do not prohibit the occasional and incidental presentation of nudity in performances at the two 'legitimate' theatres presently in the downtown zone. They point to the definitions of 'use' in the 1991 ordinance:

> "1000.81—*Use, accessory:* A subordinate building located on the same lot with the principal building, or *subordinate use of land,* either of *which is customarily incident to and serves* the principal building or *the principal use of the land.*
>
> * * *
>
> 1000.83—*Use, principal:* The primary or predominant use of any lot.

In the 1994 ordinance, currently in effect, these definitions have been refined as follows:

> "1000.6—*Accessory use:* A use of land or of a building, or portion thereof, customarily incidental and subordinate to the principal use of the land or building. An accessory use shall not be permitted without the principal use to which it is related.
>
> * * *
>
> 1000.136—*Use, principal:* The primary purpose or activity for which land or buildings are designed, arranged or intended,

or for which land or buildings are occupied or maintained."

The evidence in the record is conflicting as to whether the Director of the Department of Inspections and Standards, who is charged by Section 801 of both the 1991 and the 1994 ordinances with the initial interpretation of ordinance, subject to appeal to the Board of Review and judicial review, regards the incidental nudity in the performance presented by Trinity and PPAC as an accessory use incidental to the permitted theatre use in the D–1 zone. The City urges this Court to construe the ordinance as permitting incidental and occasional nudity in the live performances in the "legitimate" downtown theatres as accessory uses. This Court is, of course, as a State Court of general jurisdiction, not limited by any constraints of Federalism in construing local ordinances before it.

This Court accepts the City's proffered construction of the ordinances as not applying to the performances at Trinity and PPAC. Based on such a construction, the ordinances are not, in fact, overbroad in application.

In the second place, the City points out that cases like *Triplett Grille*, attempt to parse the fractured holdings in *Barnes v. Glen Theatre, Inc., supra*, to test the constitutionality of public indecency legislation which generally bans public nudity when applied to places of public entertainment. These regulations apply to behavior and not to the use of land. They are plainly prohibitory of certain specific conduct and apply without exception or limitation to that conduct wherever it may be engaged in. They involve no attempt to regulate the use of land. Since the ordinances challenged in this case do not prohibit any conduct, it is not necessary to find the narrowest grounds concurred in by a majority of the justices of the Supreme Court in the *Barnes* case. The *City of Renton* test applies. Because of the availability of other avenues of expression, where protected expression can be presented, these ordinances cannot be unconstitutionally overbroad. Nor is there any realistic danger that the zoning ordinance will be enforced against Trinity or PPAC.

*CONCLUSION*

Based on the foregoing findings, reasons and rulings, each plaintiff's complaint will be denied and dismissed. All prior restraining orders will be vacated. Judgment may enter for the defendants for their costs and reasonable counsel fees pursuant to 42 U.S.C. § 1988.