DECISION
This matter is before the Court pursuant to Rhode Island General Laws § 45-24-69. This is an administrative appeal from a decision of the Zoning Board of Review of the City of Providence ("Board") granting the Brown-RISD Hillel Foundation and the Hillel House Corporation certain relief from dimensional and parking requirements of the Providence Zoning Ordinance ("Ordinance"). The appeal is taken by fourteen individuals who reside in the general vicinity of the subject property.
 Facts/Travel
The Brown-RISD Hillel Foundation is a Rhode Island nonprofit corporation which owns Lots 260 and 261 on Providence Assessor's Plat 10. Hillel House Corporation is also a Rhode Island nonprofit corporation and it owns Lot 262 on Providence Assessor's Plat 10.[1] All lots are bordered on the south by Angell Street, on the east by Brown Street, on the north by Olive Street, and on the west by the property of Matthew L. and Yvonne G. Shilling.
The subject property is located in an R-1 zone. In 1998, the Foundation sought permission from the Board to renovate and restore the historic buildings on lots 260 and
261. Additionally, the Foundation wanted to construct:
 "(i) a one story addition at the corner of Brown and Angell Streets of approximately 1,862 square feet connecting the building at 80 Brown Street and the building at 106 Angell Street; (ii) an addition on the north side of the Property consisting of a dining/assembly space below ground which will contain approximately 1,455 square feet; (iii) new connectors between the existing buildings at 80 Brown Street, 106 Angell Street and 100 Angell Street with glass enclosed walkways; (iv) a two story connector, including handicap access on all three levels and a required second means of egress between the buildings at 106 and 100 Angell Street, a 90 square foot one story entry addition at 106 Angell Street, and a 65 square foot one story stair addition at 80 Brown Street." Id.
In its application, the Foundation also sought the following relief:
 (i) A dimensional variance from Section 304 with respect to minimum front yard, minimum side yard and minimum rear yard requirements;
 (ii) Dimensional variance from Section 304 with respect to maximum lot coverage; (iii) Relief from Section 205.1 with respect to addition, enlargement, and expansion of buildings non-conforming by parking;
 (iv) Relief from Section 202 with respect to addition and enlargement of buildings non-conforming by dimension;
 (v) A special use permit for relief from Section 700, 703.2 and other pertinent sections of the Zoning Ordinance in order to reduce the required number of parking spaces to ten spaces;
 (vi) Relief from Section 704.2 (a) with respect to curb cut requirements and Section 705 with respect to aisle width, entrance and exit to the parking area and landscaping." Id.
The aforementioned plans to renovate and rehabilitate the Hillel facilities require utilization of the neighboring lot owned by Hillel House Corporation. The Foundation and the Corporation agree that if the Foundation is granted the requested relief, the three lots owned by both the Foundation and the Corporation will merge to form a single corner lot.
On August 4, 1998, the Board held a public hearing. Testimony was heard both in support and in opposition of Hillel's application. After this hearing, the Board granted the requested relief and filed its decision on September 11, 1998. The instant appeal ensued.
 Standard of Review
Section 902.3 (A) of the Providence Zoning Ordinance sets forth the following standards:
 "A. In granting a variance, the Board shall require that evidence to the satisfaction of the following standards be entered into the record of the proceedings:
 1) that the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant;
 2) that the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
 3) that the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of this Ordinance or the Comprehensive Plan; and
 4) that the relief to be granted is the least relief necessary.
Section 45-25-69 (D) of the Rhode Island General Laws provides specific guidelines to be followed by the court when reviewing decisions of a zoning board.
 "(D) The Superior Court shall not substitute its judgment for that of the zoning board as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) in violation of constitutional, statutory or ordinance provisions;
 (2) in excess of the authority granted to the zoning board by statute or ordinance;
 (3) made upon unlawful procedure;
 (4) affected by other error of law;
 (5) clearly erroneous in view of the reliable, probative and substantial evidence of the whole record; or
 (6) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion." G. L. 1956 (1991 Reenactment).
When reviewing a decision of a zoning board, a justice of the Superior Court may not substitute his or her judgment for that of the board if he or she conscientiously finds that the decision was supported by substantial evidence. Apostolou v. Genovesi,388 A.2d 821 (1978). "Substantial evidence in this context means such relevant evidence that a reasonable mind might accept as adequate to support the conclusion and means an amount more than a scintilla but less than a preponderance." Caswell v. GeorgeSherman Sand and Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981). This standard refers to the reasonableness of the action of the zoning board on the basis of the evidence before it. UnitedStates v. Bianchi Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 1414, (1963). On appeal, the Superior Court must not abdicate its traditional function, but rather it must scrutinize the record as a whole to determine whether competent evidence exists to support the tribunal's findings. New England Naturist Ass'n, Inc., v.George, 648 A.2d 370, 371 (R.I. 1994).
Dimensional Variance Granted in Conjunction with Special Use Permit
The appellants first argue that the Board made a clear error of law when it granted dimensional variances in conjunction with a special use permit. The appellees applied for dimensional relief in order to build the proposed additions to the historic structures already located on these lots. The Board found that due to the unique characteristics of the property consisting of the three historic structures, which are nonconforming as to dimensional requirements of the Ordinance, the proposed construction does not decrease the front, side or rear yard setback distances from that of the original buildings.
In addition to the standards previously set forth, when an applicant requests a dimensional variance, he must also show, 1) that he will not yield any beneficial use if required to conform to the provisions of the Ordinance; and 2) that if denied the variance he will suffer hardship that amounts to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property; Section 902.3 (A). See also R.I. Gen. Laws §45-24-41 (D)(2).
The distinction between a dimensional deviation and a true variance is well settled. "A "true' variance is relief to use land for a use not permitted under the applicable zoning ordinance." Bamber v. Zoning board of Review of Foster,591 A.2d 1220 (R.I. 1991); see also Westminster Corp. v. Zoning board ofReview of Providence, 103 R.I. 381, 385, 238 A.2d 353, 356 (1968). Requests for dimensional deviations require a less stringent burden of proof. "A deviation is relief from restrictions governing a permitted use such as lot-line setbacks, limitations on height, on-sight parking, and minimum frontage requirements. . . . A petitioner seeking a deviation need only show an adverse impact amounting to more than a mere inconvenience." Bamber, 591 A.2d at 1223 (citing Felicio v.Fleury, 557 A.2d 480 (R.I. 1989)).
The appellees argue that a liberal enforcement of the requirement of the ordinance would amount to more than a mere inconvenience. Rabbi Alan Flam testified before the Board that Hillel House is "the synagogue for the campus Jewish community. . . . Regular worship is held throughout the year. . . . Three or more services take place at Hillel concurrently on a Friday evening, which is one of the primary reasons [they] need to expand. . . . [They] don't have adequate rooms for these separate worship services serving reform, conservative and orthodox Jewish students on the campus." RabbiAlan Flam's testimony before the Zoning board of Review, August 4, 1998.
These appellees seek to increase the Hillel facilities in order to accommodate the increased use for religious service, worship, administration, social activities and dining. "Hillel . . . is dedicated to bringing meaningful and celebratory Jewish experience to all Jewish members in the community." Princeton Review, Hillel Guide to Jewish Life On Campus, 2 (13th ed.) "RISD has a joint program with Hillel at Brown University. Monthly statewide Shabbat [are held] at Brown/RISD Hillel house . . . In addition, Hillel provides other services such as a kosher meal plan, an informal Jewish education program, a Judaica library, and extensive files on study opportunities in Israel."Id. at 195.
In their zoning application, the appellees stated that:
 "the literal enforcement of Section 304 with respect to the minimum yard requirements and the maximum lot coverage requirements and Sections 700, 703.2, 704.2A and 705 with respect to off-street parking would result in more than a mere inconvenience to the applicant such as would preclude the full enjoyment of the permitted use of the property and the conditions and circumstances provided substantial grounds for modifying such provisions for the following reasons:
 (i) the yards are consistent with or greater than existing buildings on the property which are already non-conforming in this respect;
 (ii) the existing buildings are architecturally and historically important structures and proposed yards complement such structures;
 (iii) meeting the yard requirements would materially and adversely effect the overall site plan and the ability to maintain open space on the interior of the lot;
 (iv) students visiting the property, the primary users of the property, do not have a need for parking, and;
 (v) increasing the parking would have a material and adverse effect on the site plan and the neighboring properties."
The appellees also called James M. Sloan, a real estate expert, who testified that the hardship from which the appellee's seek relief is directly tied to the attempt to incorporate, preserve and restore the historic buildings presently on the site. These buildings and their historical value constitute unique characteristics on the subject property. Sloan testified that the hardship is not due to the physical or economic disability of the appellees but rather an increased demand, from the college and Jewish community, for their resources. Finally, he testified that, in his expert opinion, the warranting of the requested relief would not alter the general character of the surrounding area.
Architect Cornelis de Boer testified extensively regarding the proposed expansion and the reasons for the design. When asked whether it was possible to locate the worship area and the assembly areas within the 106 Angell Street and 100 Angell Street building he responded:
 "We've looked at that from the very beginning. We were very concerned about adding to the existing structures, but upon very close examination, and we went through it many different times and several architects have looked at this as well, we were unable to properly accommodate the kind of assembly spaces that were called for."
 Q: "The ordinances of the City of Providence require that these historic structures be preserved, and it's obviously important to Hillel to preserve them, but would it be fair to say that those structures are functionally obsolete for the purposes and the programs of Hillel as they relate to the worship area and the assembly?"
 A: "Absolutely." Transcript, at 40-41.
Mr. Sloan relied heavily on Mr. de Boer's testimony in concluding that the relief sought is minimal for the reasonable enjoyment of the permitted use to which this property will be devoted.
In addition to dimensional deviation, the appellees applied for a special-use permit for the specific purpose of reducing the required number of parking spaces offered on these lots. A special-use permit will be granted where it is shown that neither the proposed use nor its location on the site will result in conditions that will be detrimental to the public health, safety, morals and welfare. Hester v. Timothy, 275 A.2d 637, 641-42 (1971).
Although the board granted Hillel permission to deviate from the required number of parking spaces, and did so under the auspices of a special use permit, this Court is of the opinion that this request is, in fact, a dimensional deviation rather than a special-use. The definition of dimension deviation expressly includes "relief from restrictions governing apermitted use such as . . . on-sight parking." (Emphasis added). Contrary to the special-use scenario where the permission is sought for a non-permitted use of the property, the appellees seek relief from the dimensional requirements for a permitted use.
At the hearing, Hillel submitted into the record a traffic engineering report prepared by its expert, Robert Shepard Brown.Transcript, at 43-55. In addition to being a 25 year veteran of transportation planning, Mr. Brown is a lifelong Rhode Island resident who was raised on the East Side. Mr. Brown testified before the Board that:
 "The granting of the application [with respect to the proposed plans for the expansion of the Hillel facility and the parking plans in connection with this proposal, as well as the relocation of the loading area] would not substantially or permanently injure the neighboring property. The ordinance is for one space for five seats of religous service. That, in my opinion and as stated in the report, is exceptionally high, in terms of what is actually needed on the site. . . . The best way of determining parking demands at any site is actually to do surveys, to look how it's currently used, the users of the facilities, whether or not they have cars, et cetera."
Mr. Brown also testified that it would not be possible to locate 84 parking spaces on the subject property without tearing down all of the buildings. Id. at 54. Mr. Francis J. Perry was called by the Appellants to rebut Mr. Brown's testimony. Mr. Perry has a Master's Degree in Civil Engineering and he worked at the Rhode Island Department of Transportation for thirty years (1961-1989). He is presently retired from the State and is self-employed as a traffic consultant. Mr. Perry testified that he visited the Hillel site twice, once at 1:00 on a Saturday and once at 1:00 on Friday. He spent approximately one and one half hours observing the traffic. In his opinion, this expansion "will cause significantly more traffic or visitors to the area than the residential uses or the existing residential uses will cause."
Mr. Perry's testimony was based primarily on figures listed for a synagogue or social fraternal organization listed in the Institute of Traffic Engineers' Trip Generation Manual. This manual predicts traffic increases based on the size and type of the establishment. Under oath, Mr. Perry admitted that this manual does not accurately reflect what occurs on a campus. He also stated that while Hillel is neither a synagogue nor a social fraternal organization, these descriptions are as close as he could come in the written material available to him.
Having heard both traffic engineers, the Board found Mr. Brown's testimony to be "credible, comprehensive and substantial." Resolution, par. 2 of Findings. Thereafter, the Board found that there is only a need for ten parking spaces and the relief the Hillel seeks from the requirements of the Ordinance with respect to parking will not substantially injure the use and enjoyment of, nor significantly devalue the neighboring property, nor will it be detrimental or injurious to the health or welfare of the community.
In making their argument asserting error, the appellants rely heavily on the recent decision Newton v. Zoning Bd. of Review ofthe Town of Warwick, 713 A.2d 239 (R.I. 1998). Since this Court finds that the request for relief from the parking requirements constitutes a dimensional deviation rather than a special-use permit, Newton is inapplicable. However, even if a special-use permit were required, Newton is distinguishable from the instant case.
In Newton, the applicants sought a special-use permit and a dimensional variance for the purpose of constructing a six-unit multifamily dwelling on a lot which was zoned "office." The change from "office" to "residential" was permitted under the Warwick Zoning ordinances subject to a special use permit. In addition to the special use permit, the homeowners in Newton also needed dimensional relief from the requirements of minimum-lot area, side-lot line, rear-lot line, parking line, density, design and landscaping.
The Board issued the requested relief but, on review, the Superior Court reversed, finding as a matter of law that the board had exceeded its authority. In so deciding, the Superior Court justice relied on Northeastern Corporation v. Zoning Boardof Review of New Shoreham, 534 A.2d 603 (R.I. 1987), which held that a dimensional deviation could not be granted in a situation in which a use was permitted by way of a special-use permit.Newton, 713 A.2d at 241. The Rhode Island Supreme Court affirmed the Superior Court decision, holding that a dimensional variance may only be granted in connection with the enjoyment of a legallypermitted beneficial use, not in conjunction with a use granted by special permit. Id. at 242. (emphasis added)
The facts in the instant case are distinguishable from those presented to the Newton court because, unlike Newton, the property enjoys a legally permitted beneficial use. The three subject lots currently function as a religious center for the collegiate and general Jewish community. As these lots are located in an R-1 zone, this use is legally permitted. As the facts in Newton indicate, in order for the Newton's property to be used as the proposed multifamily dwelling, the plaintiff first had to obtain a special use permit.
Accordingly, this Court's own review of the record produces no evidence of error or arbitrary and capricious decision making on the part of the Board. To decide differently on this matter would be an inappropriate substitution of this Court's judgment for that of the Board. As the evidence supports the board's finding, there is no ground on which to reverse.
 Comprehensive Plan
In 1991, the General Assembly enacted P.L. 1991, ch. 307
adding § 45-24-27 through 45-24-72. These sections provide that all municipal zoning ordinances must now be developed and maintained in accordance with a comprehensive plan prepared and adopted in accordance with Chapter 45-22.2 of the Rhode Island General Laws. DiRaimo v. City of Providence, 714 A.2d 554 (R.I. 1998).
The 1993 comprehensive plan set as one of the policies for citywide planning:
 "Preserve the character of Providence by protecting neighborhoods from : inappropriately scaled developments; ensuring low to medium density residential areas; and, inappropriate uses in residential and commercial areas." Id.
The appellants argue that the Board did not entertain testimony regarding the project's effect on the Comprehensive Plan. They further assert that "expansion of its [Hillel's] multiple institutional, cultural service, and educational uses, whether principal or accessory to religious services, are inappropriate for a residential zone on the scale proposed. * * * [T]he Zoning Board's decision clearly impairs the purpose and intent of the Comprehensive Plan." Memorandum at 25.
Review of the transcript provides evidence to the contrary. James Sloan, real estate expert, testified extensively about the effect this project would have on the surrounding neighborhood. In response to the question "[i]n your opinion, would the warranting of the relief alter the general character of the surrounding area or impair the intent or purpose of the ordinance for the comprehensive plan?," Mr. Sloan gave an extensive, thoughtful, response.
 "In order to answer that question, I've had to consider all of the uses in the immediate area. . . . Very significant, I think, institutional uses, which dominate the northerly, northeasterly, easterly, and southeasterly, and southerly side of the property in question. But you also have well-maintained single-family dwellings. In looking at those particular uses as compared with the institutional uses, I think it's significant to note that either with Hillel House aside, that there is a significant and very dominant presence of the institutional uses or the nonsingle-family residential uses in this R-1 zone. . . . So I think both the institutional or the nonresidential characters of the project and also the religious aspect of the project, features which have been in existence in this area for many, many, years and presumably will continue to be, and for that reason, I cannot [en]vision how the general character of the surrounding area would be altered or adversely affected. In looking at the ordinance and the comprehensive plan, . . . that when one speaks of religious facilities and religious activities, places of worship, places for assembly and things of that nature, there are very few places in any of the ordinances that I have read which would try to prohibit or discriminate against accommodating an expansion of the needs of a particular religious community. So again, from a land use standpoint, I cannot envision how this would impair the purpose or the intent of the . . . comprehensive plan." Transcript
at 62.
The appellants aver that Mr. Sloan's testimony does not address that part of the Comprehensive Plan which speaks to lowering or maintaining neighborhood density. This Court again disagrees with appellants' position. Mr. Sloan has visited this site four times before forming his "expert" opinion regarding the expansion's effect on the general community. Sloan was not asked a direct question regarding the project's effect on neighborhood density but his testimony taken as a whole evidences his consideration of this matter.
His expertise and experience are not to be slighted; neither will semantics reduce the import of his opinion. This Court concurs with the Board's finding that Mr. Sloan's testimony was aptly credible, especially in light of the other witnesses, to support the conclusion that this proposal not only contemplates but embraces the city's Comprehensive Plan.
The neighborhood in which Hillel is situated is presently largely populated by nonresidential buildings. Brown University and Rhode Island School of Design largely contribute to this use of the neighborhood. The design of the proposed project is consistent with the general character of the surrounding area. It incorporates rather than destroys the historical structures housed on the land. Care has been taken to locate kitchen and service related functions off the residential Olive Street and instead house them on the more commercial Angell Street. Additionally, in response to communications from their neighbors, Hillel has spent time improving the streetscape on Olive Street by planning for the construction of architectural fencing, landscaping, and improved paving.
Further, the Board heard testimony from Cornelis de Boer, consulting architect for the Brown-RISD Hillel Foundation. Mr. de Boer attested to the necessity of this enlargement in order to accommodate the religious purpose of Hillel. His detailed explanation of the new facility evidenced the care and attention to the preservation of the historic houses on the property and the character of the neighborhood.
Therefore, the Court finds overwhelming testimonial evidence to support the Boards finding that these renovations are consistent with the Comprehensive Plan.
 Fair and Impartial Hearing
The appellants next argue that they were not afforded a fair and impartial hearing. First, the appellants cite the Board's decision to read into the record a letter to Rabbi Flam from the City Building Inspector. The objectors argue that they were not given the right to place on the record any evidence or testimony contrary to that finding of the Building Inspector.
This argument baffles the Court because the transcript indicates no attempt to raise this issue before the Board. After Rabbi Flam testified, the objectors remained silent. After the letter was read, again silence. When one chooses to sit on his rights at the hearing level, he cannot cry foul on appeal.
Next appellants cite to a part of the hearing in which the Board "interrupted" a witness as he was testifying. The individual on the stand was lay witness, a neighbor residing on Olive Street. His testimony encompasses eight pages of the transcript. The "interruption" to which the objectors refer occurred as this individual was answering the first question. When read in context, it is clear that the Board was attempting to keep the testimony on-track. In his remaining time on the stand, this witness thoroughly describes his perception of the street and neighborhood as well as the reasons he believes the proposed expansion would have an extraordinary detrimental effect on the neighborhood.
The final incident supporting appellants argument also pertains to an "interruption" which occurred during the examination of J. Clifton O'Riley, Jr., a real estate consultant. Fairly early in his testimony, Mr. O'Riley categorized Hillel as a "commercial type" use. At this point, a board member said, "I believe it is a religious use." Mr. O'Riley barely acknowledged this correction and continued with his extensive testimony. The Court is hard pressed to find any prejudicial effect resulting from this corrective statement.
In total, the appellants presented five witnesses. Each one was given a full and fair opportunity to be heard. Additionally, the appellants were given the same opportunity to challenge or cross-examine the witnesses produced by the appellees. Our state Supreme Court has stated that as long as both parties are provided the opportunity to present evidence and call witnesses, then a full and fair hearing has been conducted. State v. Wiggs,635 A.2d 272 (R.I. 1993). Accordingly, this Court finds no reversible error.
 Religious Use
The appellants' final argument is that the applicant's current and proposed use of the property is nonconforming because it has educational, cultural, social and other uses in addition to religious services. In support of this assertion, they cite the Ordinances which prohibit higher educational institutions, special schools, fraternal and service organizations, eating and drinking establishments, and spectator assembly.
Hillel does not fall within the category of any of these prohibited uses. As Rabbi Flam testified, the purpose of Hillel is to provide religious services to Jewish young people on college campuses. Any religious education, social event, lecture or dining experience stems directly from this primary goal of furthering spiritual well-being within the young Jewish community.
The Court finds no merit to appellants' argument. The Board's decision is upheld.
 No Error
The arguments heretofore addressed in this decision were raised by the parties above and beyond those issues this Court is required by R.I.G.L. § 45-25-20 to consider when reviewing a zoning board decision. As previously stated, when faced with an application for dimensional variances or special use permits, the zoning board must consider those factors listed in the Ordinance.
For the foregoing reasons, this Court finds, after reviewing the entire record, that the decision of the Board was based on reliable, probative and substantial evidence, and that the granting of the relief sought was proper. Accordingly, the appeal is dismissed and the decision of the Board is affirmed.
Counsel shall prepare an order consistent with the decision of this Court.
[1] Lot 260 is identified as 100 Angeli Street, Lot 261 is identified as 106 Angeli Street, and Lot 262 is identified as 80 Brown Street.