CASA DiMARIO, INC.

v.

Kenneth RICHARDSON et al.

Casa DiMario, Inc.

v.

Leo Fox et al.

Nos. 99–84–Appeal, 99–162–Appeal.

Supreme Court of Rhode Island.

Dec. 18, 2000.

John B. Lawlor, Jr., John B. Harwood, Pawtucket, Albert R. Romano, Providence, for Plaintiff.

R. Kelly Sheridan, Marc DeSisto, John M. Verdecchia, Kathleen M. Powers, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

The legality of a municipal ban on nude barroom dancing returns to our table in this case. Last term, in *El Marocco Club, Inc. v. Richardson,* 746 A.2d 1228 (R.I. 2000), we grappled with several of the same issues raised by these consolidated appeals. There, we held that the General Assembly had authorized the defendant Town of Johnston (town) to enact the identical anti-nudity ordinances—namely, town ordinances Nos. 965 and 1057—that are challenged here. *Id.* at 1231–33. In *El Marocco,* we ruled that, under applicable state law, the town was within its authority when it enacted ordinances that effectively imposed an anti-nudity condition upon its issuance of Class B liquor licenses. *Id.* We also held that the ordinances in question did not violate the freedom-of-speech rights of the El Morocco Club, an adult-entertainment establishment in the town that, like the plaintiff, Casa DiMario, Inc., d/b/a "Mario's Showplace" (Mario's), regu-larly featured nude barroom dancing on its premises. *Id.* at 1238–39.

Moreover, last term the United States Supreme Court also addressed the validity of a municipal anti-nudity ordinance in *City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), concluding that a local Pennsylvania ordinance banning public nudity was lawful as applied to an adult-entertainment establishment featuring displays of nudity. *Id.* at 281, 120 S.Ct. at 1387, 146 L.Ed.2d at 274.

Notwithstanding the *El Marocco* and *City of Erie* decisions, Mario's still presses its appeals. In the first of the two consolidated cases before us (No. 99–84–A.), Mario's takes issue with various aspects of a Superior Court judgment. The trial court refused to apply the doctrine of equitable estoppel against the town, upheld the town's authority to enact an anti-nudity ordinance after the General Assembly amended G.L.1956 § 3–7–7.3 in 1997 (*see* P.L.1997, ch. 9, § 1) (the 1997 amendment), and declined to reach Mario's other claims, including its allegation that the town had violated its free-speech rights in attempting to enforce ordinance No. 965 against it. And the town asks us to vacate that portion of the Superior Court's judgment in No. 99–84–A. that invalidated the town's first anti-nudity ordinance (No. 965). We consolidated these appeals with Mario's appeal (No. 99–162–A.) from a second Superior Court judgment denying Mario's request for injunctive relief against the town's enforcement of a second anti-nudity ordinance (No. 1057) that it enacted after the General Assembly's 1997 amendment.

Mario's asserts that neither the *El Marocco* case nor the *City of Erie* case has resolved all of the issues raised by its appeals. In particular, it argues that the Superior Court erred when it vacated a consent order signed by the town solicitor in Mario's first lawsuit against the town. The court did so because it ruled that the

solicitor lacked the authority to settle that case and that the town council (council) had declined to ratify the consent order signed by the solicitor. But Mario's insists that the solicitor possessed—at the very least—apparent *authority* to settle the lawsuit; that the council indeed ratified the settlement; and that, in any event, the town should be estopped by its conduct from enforcing the town's anti-nudity ordinances against Mario's. Mario's also posits that the General Assembly "grandfathered" its right to present nude-dancing entertainment when it enacted G.L.1956 § 5–72–2(b) as part of its 1997 amendment. *See* P.L.1997, ch. 9, § 2. We address these issues below, together with Mario's other arguments, as well as the state's appeal with respect to the validity of ordinance No. 965.

## I

## Propriety of Vacating the Consent Order

■ The trial justice, we hold, properly vacated the consent order because the town's solicitor never possessed any actual or apparent authority on behalf of the town to compromise the pending claims involving Mario's on the terms set forth in the consent order. Moreover, the alleged conduct by individual town officials assuring Mario's that it was or would be "grandfathered" against the town's anti-nudity ordinances was insufficient as a matter of law to estop the town from vacating the settlement or enforcing the anti-nudity ordinances against Mario's.

■ In the course of defending the town against Mario's first lawsuit challenging the validity of ordinance No. 965, the solicitor signed a consent order that purported to settle the case. There, he agreed that the town would not enforce the anti-nudity provisions of any present or future ordinances against Mario's. But the council never had authorized the solicitor to settle Mario's lawsuit on this basis. Indeed, even the council would not have had the power to bind future councils by promising not to enforce yet-to-be-enacted ordinances against Mario's. *See Parent v. Woonsocket Housing Authority,* 87 R.I. 444, 447, 143 A.2d 146, 147 (1958). Thus, the solicitor unquestionably lacked the actual authority to settle the case on the terms set forth in the consent order. In addition, however, the solicitor lacked any implied or apparent power to settle such a case on behalf of his or her client unless the client had authorized the attorney to do so or thereafter had ratified the attorney's settlement. *See Parrillo v. Chalk,* 681 A.2d 916, 919 (R.I.1996). And unlike the situation in *Mansolillo v. Employee Retirement Board of Providence,* 668 A.2d 313 (R.I.1995), the municipality in this case did not stipulate that its attorney was authorized to settle the lawsuit in question.

■ We have repeatedly held that "the authority of a public agent to bind a municipality must be actual * * *." *Warwick Teachers' Union Local No. 915 v. Warwick School Committee,* 624 A.2d 849, 850–51 (R.I.1993). "Consequently, any representations made by such an agent lacking actual authority are not binding on the municipality * * *." *School Committee of Providence v. Board of Regents for Education,* 429 A.2d 1297, 1302 (R.I.1981). Moreover, the general rule throughout this country is that, absent actual authority to do so, a municipal attorney may not compromise claims or consent to judgments against the municipality. *See generally,* 10 Eugene McQuillin, *The Law of Municipal Corporations* § 29.15 at 308 (3d Ed.1999). Because the town solicitor had no actual or apparent authority to compromise the litigation between Mario's and the town or to enter into the consent order on behalf of the town, the council was entitled to reject its terms upon receiving notice of the proposed settlement.

■ For these same reasons, Mario's professed reliance upon private discussions with and alleged statements by individual members of the council, the town clerk, and/or the solicitor to representatives of

Mario's and upon the town's alleged past practice of allowing the solicitor to settle certain cases involving the town without a formal prior vote of the council were misplaced and unjustified. Communications, representations, and alleged acts of this kind are insufficient as a matter of law to bind a municipality to future acts or inaction. *See, e.g., School Committee of Providence*, 429 A.2d at 1302 (holding that school principal's alleged representations to a per-diem substitute teacher that he would be employed until the absent teacher returned to work were *ultra vires*; therefore, the substitute teacher was not entitled to rely thereon). Rather, a city or town can bind itself on such matters only by the official acts of its town council or by the authorized actions of its representatives. *See El Marocco Club, Inc.*, 746 A.2d at 1234. According to Johnston's charter, the council may act in its official capacity only in the form of a rule, an ordinance, or a resolution. *See* Town of Johnston Town Home Rule Charter, § 3–9. There is no record in the council's minutes of any meeting on or before October 7, 1997, (the date of the consent order) evidencing any resolutions or other action taken by the council requesting, authorizing, or permitting the solicitor to settle Mario's claims on the terms set forth in the consent order, nor is there any charter provision that would authorize the solicitor's settlement. Without a properly convened meeting at which council members vote on the record in their official capacity, the council cannot be deemed to have exercised or delegated to the solicitor its powers to compromise Mario's lawsuit against the town. *Id.* Thus, any putative reliance by Mario's on communications from the solicitor, individual council members, or from other town officials concerning Mario's alleged "grandfathered" status vis-à-vis the town's anti-nudity ordinances would not have been justified. *See El Marocco Club, Inc.*, 746 A.2d at 1233–34 (holding that party asserting equitable estoppel must *justifiably* rely upon misrepresentation made by *authorized* municipal agents).

■ But Mario's further argues that, even if the solicitor initially lacked the authority to bind the town to a settlement with Mario's that would "grandfather" its preexisting nude-entertainment operations, the council later ratified his actions in doing so, thereby committing the town to the settlement. But the facts do not support its contention. On October 20, 1997, during a town council executive session, the solicitor reported to the three town council members who were present that he had settled the town's pending case with Mario's. Although two of the three council members who were present at that meeting then voted to ratify this settlement as it was reported to them orally by the solicitor, one week later the council unanimously passed a resolution reconsidering that vote and rejecting the settlement. Like other deliberative bodies, the council possessed "the undoubted right to vote and reconsider its vote upon measures before it." *Johnson v. Eldredge*, 430 A.2d 1069, 1071–72 (R.I.1981) (quoting 4 McQuillin, *Municipal Corporations* § 13.48, at 599 (3d. ed. rev.1969)). The council's rules and charter provided that "when a vote has been passed, it shall be in order for the council to move its reconsideration any time within thirty (30) days of its initial passage, at any special and regular meeting." Johnston Council Rules, 1997–99, Article IX. Here, one week after the initial two-to-one vote ratifying the settlement, the council unanimously reconsidered that vote and rejected it by a five-to-zero margin. Accordingly, the town, duly acting through its council, ultimately refused to ratify the settlement embodied in the solicitor's consent order, thereby entitling the town to obtain a court order vacating the settlement under these extraordinary circumstances. *See Richardson v. Smith*, 691 A.2d 543, 546 (R.I.1997) (listing "lack of actual consent" to an order as an "extraordinary circumstance" that could be relied on by a trial justice to vacate an order under Su-

per.R.Civ.P. 60(b)); *see also Brown v. Amaral,* 460 A.2d 7, 11 (R.I.1983).

■ A motion for relief from a judgment such as the consent order under Rule 60(b) of Superior Court Rules of Civil Procedure "is addressed to the trial justice's sound judicial discretion and his ruling will not be disturbed on appeal absent a showing of an abuse of discretion or an error of law." *Brown,* 460 A.2d at 11. Here, we hold that because the solicitor lacked actual authority to enter into the settlement and the town refused to ratify the unauthorized settlement, the trial justice did not abuse his discretion nor err as a matter of law when he vacated the consent order. *See Bendix Corp. v. Norberg,* 122 R.I. 155, 404 A.2d 505, 506 (1979) (holding that Rule 60(b)(6) "vest[s] the Superior Court with broad power to vacate judgments whenever that action is appropriate to accomplish justice" but that " 'the circumstances must be extraordinary to justify relief' "); *see also Bradford Exchange v.. Trein's Exchange,* 600 F.2d 99, 102 (7th Cir.1979) (holding that an attorney's lack of authority to consent to a final disposition of his client's case would be grounds for the client to have a resulting consent order vacated under Fed.R.Civ.P. 60(b)(1)). Hence, we have no basis to disturb the trial justice's vacation of the consent order.

## II

### Estoppel Against the Municipality

■ "As a general rule, courts are reluctant to invoke estoppel against the government on the basis of an action of one of its officers." *Lerner v. Gill,* 463 A.2d 1352, 1362 (R.I.1983). Indeed, any party dealing with a municipality " 'is bound at his own peril to know the extent of its capacity.' " *Vieira v. Jamestown Bridge Commission,* 91 R.I. 350, 358, 163 A.2d 18, 23 (1960) (quoting *Austin v. Coggeshall,* 12 R.I. 329, 332 (1879)). Thus, for Mario's to establish that it was entitled to the benefits of the equitable estoppel doctrine against the town, it would have

> "had to show that one or more *duly authorized* representatives of the town affirmatively represented to it by word or deed that—notwithstanding the town's future enactment of ordinances outlawing such conduct—it still would be allowed to offer nude dancing at its liquor-serving establishment; that such representations were designed to induce plaintiff's reliance thereon; and that plaintiff actually and *justifiably relied thereon* to its detriment." *El Marocco Club, Inc.,* 746 A.2d at 1234. (Emphases added.)

Here, the only evidence Mario's adduced in support of its estoppel argument was that the town solicitor, one or more individual council members, and/or the town clerk allegedly assured Mario's attorney and another representative of Mario's that it would be "grandfathered" against application of any of the town's present and future anti-nudity ordinances that were then in effect, under consideration, or that might be enacted in the future. But neither the solicitor's alleged representations nor those of any individual council members or other town officials were those of "duly authorized representatives of the town" vis-à-vis the alleged promise of grandfathered status. *Cf. Providence Teachers Union v. Providence School Board,* 689 A.2d 388, 392 (R.I.1997) (holding that union was not allowed to rely upon representations of school board concerning the validity of a collective bargaining agreement because the board lacked the capacity to bind the municipality without the city council's ratification of the agreement); *see also Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1237–38 (R.I.1998) (holding that, because Director of State Department of Corrections had no authority to modify collective bargaining agreement by orally agreeing to past practice allowing paid full-time leave for employees to work on union business,

Governor was not precluded from defining what grounds might exist to withhold state approval for such paid-leave requests). None of them possessed any actual or apparent authority to make such statements because, absent special circumstances not present here, a city or town council acts through a majority vote of those members who are present at a duly convened meeting of the council. *See, e.g.,* Johnston Town Charter, § 3–9(a) (authorizing council to act by rule, ordinance, or resolution).

Here, as in *Technology Investors v. Town of Westerly,* 689 A.2d 1060, 1062 (R.I.1997) (holding that a municipality cannot enact an ordinance in contravention of state law), "[t]he significant policy that undergirds this rule cannot be set aside by estoppel. * * * Such an estoppel cannot be applicable when the municipality's acts were clearly ultra vires." Thus, any putative detrimental reliance by Mario's on the town's alleged past practice of settling lawsuits via its solicitor without specifically authorizing him to do so and on the representations of any individual council members, the solicitor, or the town clerk concerning whether the council would "grandfather" Mario's against enforcement of the town's present and future anti-nudity ordinances would not have been justified. *See id. See also Ferrelli v. Department of Employment Security,* 106 R.I. 588, 594, 261 A.2d 906, 910 (1970) (stating that a public agency or its officers must be "acting within their authority" before the doctrine of estoppel can be applied against them). Hence, the trial justice properly rejected Mario's estoppel claim.

## III

### Town's Authority to Prohibit Nudity at Liquor Licensees

▮ Notwithstanding our decision in *El Marocco,* Mario's argues that the town lacked the power to prohibit nudity at Class B liquor-licensed establishments in the town until the General Assembly enacted the 1997 amendment. This law added a new chapter 72 to title 5 of the General Laws and amended § 3–7–7.3 by expressly allowing all cities and towns to allow or to prohibit entertainment at liquor-licensed establishments like Mario's. Because nude dancing is a subspecies of entertainment, the 1997 amendment to § 3–7–7.3 expressly enabled the town to ban nude dancing at Class B liquor licensees in the town. Through its enactment of chapter 72 of title 5, the General Assembly's 1997 amendment also expressly empowered the town to license establishments featuring nude entertainment, to limit the hours of such establishments, and to designate specific areas within the town where nude entertainment would be permitted, and/or to prohibit the operation of any new such establishments featuring nude entertainment. Mario's also contends, however, that § 5–72–2(b)'s [1] "any new such establishment" language serves to exempt it from the reach of the town's delegated power to prohibit nudity at liquor-serving establishments because its nude-dancing operations preexisted the 1997 amendment.

In *El Marocco,* however, we held that the 1997 amendment "merely clarified what was already implicit in the preexisting versions of §§ 3–5–15 and 3–5–21: namely, a legislative intention to allow municipalities to impose reasonable conditions upon the holders of Class B liquor licenses." *El Marocco Club, Inc.,* 746 A.2d at 1233. Therefore, even before the 1997 amendment, the town had the power to impose reasonable conditions (e.g., no displays of nudity at liquor-serving venues) upon the issuance of Class B liquor licens-

---

1. The General Assembly enacted the most recent amendments to § 5–72–2 on March 25, 1997. *See* P.L.1997, ch. 9, § 2. However, for unknown reasons, certain portions of these amendments, including the "any new such establishment" language we refer to in this opinion, were not incorporated into the 1999 Reenactment of the General Laws of Rhode Island. *Compare* P.L.1997, ch. ·9, § 2 *with* G.L.1956 § 5–72–2.

es in the town. Thus, as we held in *El Marocco*, the town's adoption of Ordinances Nos. 965 and 1057 were valid codifications of its preexisting power to do so. *Id.* at 1231, 1233. The 1997 amendment did not limit the town's power in this respect because it merely "confirm[ed] that entertainment-related conditions imposed by municipalities upon the holders of liquor licenses are indeed within their preexisting power to subject the granting of such licenses to reasonable conditions." 746 A.2d at 1233.

Moreover, the 1997 amendment as originally proposed would have explicitly exempted Class B liquor licensees like Mario's—those operating before the effective date of the amendment—from any municipal nudity prohibitions. But the General Assembly eliminated this specific "grandfathering" provision from the final version of the law.[2] Thus, we are convinced—in the words of the trial justice who first ruled on this question—that "it was not the intent of the legislation as passed to grandfather [Mario's], but clearly [it] was the intent to provide for uniform application of the law throughout the town."

■■■■■■ Nor does the "any new such establishment" language in § 5–72–2(b) amount to a "grandfathering" clause for Mario's. Section 5–72–2(b) reads:

"*The town council shall have the power to* limit the hours of operation of any such establishment and may *designate specific areas within the town of Johnston where nudity on the premises* where alcoholic beverages are offered for sale or consumption on the premises *may be permitted and/or to prohibit the operation of any new such establishment after the effective date of this act.*" P.L.1997, ch. 9, § 2. (Emphases added.)

Mario's argues that § 5–72–2(b) allows the town only to prohibit nudity on the premises of "any new such establishment after the effective date" of the 1997 amendment. Thus, it contends, the necessary implication of this statute is that the town may not prohibit nudity at Class B liquor-licensed establishments like Mario's that were operating before the effective date of the 1997 amendment. But we held to the contrary in *El Marocco* when we stated that the 1997 amendment to § 3–7–7.3 merely confirmed what was already the law under G.L.1956 §§ 3–5–15 and 3–5–21: namely, that "*any* city or town" possesses the power to restrict or prohibit entertainment (including nudity) at Class B liquor-license establishments, provided that such restrictions or prohibitions apply "*uniformly to all* such licensed facilities." P.L. 1997, ch. 9, § 1 (Emphasis added); *see El Marocco Club, Inc.,* 746 A.2d at 1232. We interpret the "all such licensed facilities" language in § 3–7–7.3 to signify a legislative intention that whatever restrictions or prohibitions a town may enact in this area must be applied both to preexisting and to new establishments—that is, to *all* such licensed facilities in the municipality. Thus, the changes to § 3–7–7.3 as amended by the 1997 amendment (effective March 25, 1997), refute any notion that its provisions are inapplicable to establishments like Mario's that preexisted this amendment. Indeed, before the 1997 amendment, § 3–7–7.3 authorized certain cities or towns only to "restrict or prohibit entertainment at such *newly* licensed facilities, provided that any such restriction(s) or prohibition applies uniformly to all such *newly* licensed facilities." P.L.1993, ch. 374, § 1. (Emphasis added.) But the 1997 amendment to §. 3–7–7.3 deleted these two

**2.** An earlier version of 97–009 (identified as 97–S–0899) included an exemption section providing that "[a]ny existing establishment which allows nudity on the premises where alcoholic beverages are offered for sale or consumption on the premises on the effective date of this act, shall be granted a license without being required to comply with the provisions of this chapter." This language would have served to "grandfather" Mario's from the anti-nudity provisions of the 1997 amendment. But the Senate Committee on Corporations deleted this provision from the bill and it was never enacted as law. *See* 97–S–0899 ("as amended").

previous references in the statute to "newly" licensed facilities, thus demonstrating a clear legislative intent that any municipal prohibition or restriction upon entertainment must be applied to *all* liquor licensees in the city or town, not just to new or future licensees. P.L.1997, ch. 9, § 1.

For these reasons, any grandfathering provision in § 5–72–2(b) for Mario's or for other similarly situated establishments would directly contradict the Legislature's manifest intention in § 3–7–7.3 that "any city or town" shall have the power to regulate and/or prohibit entertainment at all such Class B establishments in the municipality and that such regulations shall be "uniform[ ]" and applicable to "all such licensed facilities" in the town. *Id.* In our opinion, the Legislature did not intend its 1997 amendment to § 3–7–7.3 to be contradicted by any actual or imagined grandfathering clause in § 5–72–2(b) of that same amendment. Indeed, it specified in § 3–7–7.3 that the municipal power to prohibit certain types of entertainment at "all such licensed facilities" in the town was to prevail "notwithstanding any provision of this chapter or in the Rhode Island General Laws to the contrary." *Id.* And as we noted in *El Marocco,*

> "§ 3–7–7.3, as amended in 1997, grants to municipalities the specific authority to *prohibit* all entertainment at establishments holding Class B liquor licenses. Because Ordinance No. 1057 was passed *after* the 1997 effective date of § 3–7–7.3, the town unquestionably possessed the statutory authority to enact an ordinance that would effectively prevent nude entertainment at the town's liquor-serving establishments." *El Marocco Club, Inc.,* 746 A.2d at 1231.

Thus, we are persuaded that § 5–72–2(b), as enacted by P.L.1997, ch. 9, § 2 did not serve to "grandfather" Mario's against enforcement of the town's anti-nudity ordinances. Furthermore, as noted in *El Marocco,* the 1997 amendment to § 3–7–7.3 expressly confirmed that all municipalities may prohibit or restrict entertainment at Class B licensees within the municipality. *El Marocco Club, Inc.,* 746 A.2d at 1232–33. Section 3–7–7.3 contains no exceptions or "grandfathering" language of any kind. Although the 1997 amendment added a new chapter to the General Laws (chapter 72 of title 5) that authorized the town to *license* adult entertainment establishments, *see* § 5–72–2(a), and to *designate specific zones* within the town where such establishments may be located, and/or where any *new* such establishments may be prohibited, *see* § 5–72–2(b), this latter subsection—which Mario's calls a grandfather provision—also provides that in the event the town designates zones or districts within the town where adult entertainment may be restricted, such adult-entertainment zoning or districting should be applied prospectively only vis-à-vis any new such establishments. In short, this portion of § 5–72–2(b) is nothing more than a legislative recognition that, as to the town's prospective designation of specific areas in the town allowing or banning displays of nudity on the premises, such an ordinance should apply prospectively only to any new establishments that may in the future apply for an adult-entertainment license. But the ordinances that are the subject of this litigation (Nos. 965 and 1057) are not ordinances designating adult-entertainment zones or specific areas in the town where public displays of nudity are or are not allowed. Rather, these ordinances provide for anti-nudity restrictions or conditions on alcoholic beverage licensees and were enacted pursuant to the town's authority to do so under §§ 3–7–7.3, 3–5–15, and 3–5–21. *See El Marocco Club, Inc.,* 746 A.2d at 1233. For these reasons, we reject the argument that the town lacked the authority to apply any of the ordinances in question to Mario's.

## IV

### Overbreadth

Mario's also challenges the town's anti-nudity ordinances by claiming that they are too broad under both the State

and Federal Constitutions because they "sweep out the high brow theatrical nudity along with the lowbrow burlesque nudity."

 Although on their face the town's ordinances could be construed to extend beyond clubs like Mario's that feature "lowbrow burlesque nudity" and, therefore, to reach "highbrow" theatrical productions such as "Equus" or "Hair" that include incidental nudity,[3] such a construction would be inconsistent with the history and purpose of these ordinances. In *El Marocco,* we reviewed the available municipal legislative history of the town's anti-nudity ordinances and concluded that they were targeted *not* at suppressing expressive activity but rather at combating the adverse secondary effects of combining public nudity with alcohol consumption. *El Marocco Club, Inc.,* 746 A.2d at 1238. Therefore, we construe these ordinances to regulate only those regular and substantial combinations of nudity and alcoholic-beverage consumption associated with the harmful secondary effects that the town expressly sought to reduce or eliminate. Moreover, "[i]t is well settled that this Court will presume a legislative enactment * * * to be constitutional and valid and will so construe the enactment whenever such a construction is reasonably possible." *State v. Fonseca,* 670 A.2d 1237, 1240 (R.I. 1996). And as a state court of last resort, we are not limited by federalism constraints in construing municipal ordinances. *See DiRaimo v. City of Providence,* 714 A.2d 554, 567 (R.I.1998).

In *DiRaimo,* we held that

"when the guarantee of free speech in article 1, section 21 of the Rhode Island Constitution is implicated by an adult-entertainment ordinance which is con-tent-neutral and allows for reasonable alternative venues for such adult entertainment, the government has the further burden of proving that the adult-entertainment activity regulated by the ordinance is a regular and substantial part of a business's course of conduct." *DiRaimo,* 714 A.2d at 565 n. *.

The record in this case clearly established that the combination of public nudity and alcoholic-beverage sales were a regular and substantial part of Mario's business. The additional state constitutional requirement imposed in *DiRaimo* was intended to insure that an adult-entertainment ordinance was "narrowly tailored to support the asserted purpose of the ordinance and to affect only those categories of activity shown to produce unwanted secondary effects and not to bring within its purview other legitimate forms of expression characterized by only occasional or incidental adult-entertainment activity." *Id.*[4] Because neither Mario's nor the town presented any evidence showing the existence of any "highbrow" theatrical productions at establishments in town where liquor may be served—much less any evidence linking the occasional or incidental appearance of nudity in such productions to the harmful secondary effects that were the target of the town's anti-nudity ordinances—we hold that these ordinances have not been applied, were not intended to be applied, nor should they be applied to prohibit such forms of entertainment "characterized by any occasional or incidental adult-entertainment activity." *Id.* Therefore, so construed, they are not overbroad.

## Conclusion

For these reasons, we deny Mario's appeals in their entirety and affirm the Supe-

---

3. Mario's has not suggested nor does the record reflect the existence of any "highbrow" theatrical productions in the town to which the town has attempted to apply its anti-nudity ordinances.

4. Thus, *DiRaimo* provides a municipality with the means to defend the constitutionality of an anti-nudity ordinance without having to show the harmful secondary effects of the regulated activity in each particular application of the ordinance—provided that "the adult-entertainment activity regulated by the ordinance is a regular and substantial part of a business's course of conduct." *DiRaimo v. City of Providence,* 714 A.2d 554, 565 n. * (R.I.1998).

rior Court's judgments in all respects, except that, for the reasons set forth in our *El Marocco* decision, we sustain the town's appeal in No. 99–84–A. (*Casa DiMario, Inc. v. Richardson*) and vacate the permanent injunction entered against the town preventing it from enforcing ordinance No. 965 against Mario's. Accordingly, the papers in this case shall be remanded to the Superior Court for entry of a new judgment in No. 99–84–A. consistent with this opinion.