******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BELLSITE DEVELOPMENT, LLC *v.* TOWN OF
MONROE ET AL.
(AC 35433)

Gruendel, Alvord and West, Js.

*Argued October 15, 2014—officially released January 27, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Peck, J.)

*Richard C. Robinson*, with whom were *John P. Fra-
cassini, Nathaniel J. Gentile*, and on the brief, *Benja-
min B. Manchak*, for the appellants (defendants).

*Jack G. Steigelfest*, with whom was *Thomas P. Cella*,
for the appellee (plaintiff).

*Opinion*

GRUENDEL J. The defendants, the Town of Monroe (town) and Andrew J. Nunn,[1] appeal from the judgment of the trial court denying their motion to set aside a jury verdict awarding the plaintiff, Bellsite Development, LLC, damages on claims of breach of contract and negligent misrepresentation. On appeal, the defendants claim that the court abused its discretion when it denied the motion to set aside the verdict because the jury's findings of a breach of contract and negligent misrepresentation were unsupported by the evidence. We agree and accordingly reverse the judgment of the trial court.

In reviewing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have found the following facts. In 2000, the town sought to improve the communications systems of its police department. Due to the topography of the town, the existing communication network suffered from "dead spots," which were areas of town where the communication equipment could not receive a signal. In response to this problem, the town created an ad hoc committee tasked with the responsibility of evaluating potential sites for a new communications tower. The hope was that the new tower would improve the signal coverage and eliminate "dead spots" throughout the town. Sometime in early to mid-2001, the ad hoc committee presented the Monroe town council with a report, which included potential locations for a new tower, cost estimates, and height requirements.

After some discussion, the town officials determined that there were three potential locations for the new communications tower. Two of the potential sites were later eliminated from consideration, however, because they were located within the town's historic district. The remaining potential site was on property owned by the Monroe Volunteer Fire Department (fire department). The fire department was an independent organization and was not affiliated with the town.

In the spring of 2001, Karen Burnaska, the town's first selectman,[2] met several times with William Bellrock, the manager of the plaintiff. According to both parties, Burnaska was interested in having the tower built at the fire department location and the plaintiff was interested in working on the project. Both parties acknowledged that prior to the start of construction at the fire department location, a ground lease would need to be obtained, specific radio frequency tests would need to be conducted, and a zoning application would need to be approved.

After some discussion, Burnaska suggested to Bellrock that the plaintiff could construct and own the communications tower, while reserving space on the tower for the Monroe Police Department's communication equipment.[3] Under such an arrangement, the plain-

tiff would derive revenue by renting tower space to various private communications companies. This meant that the plaintiff would need to submit the application and enter into the ground lease with the fire department on its own behalf, rather than as a representative of the town. The plaintiff needed the town to locate its equipment on the tower so that it could qualify as a municipal tower. According to Bellrock, plans to build municipal towers only required approval of a special permit application by the Monroe Planning and Zoning Commission (zoning commission).[4] By contrast, non-municipal tower applications were required to be filed with the Connecticut Siting Council. Bellrock testified that siting council applications were "extremely expensive" and that he had no prior experience with the siting council's process. Bellrock believed he needed the town to locate its equipment on the tower; otherwise he would have abandoned the plan altogether. Ultimately, Bellrock told Burnaska that if the town would locate its equipment on the tower, then the plaintiff would not charge rent for the space. Bellrock testified that in the spring of 2001, Burnaska agreed.

After reaching an agreement with Burnaska, the plaintiff began pursuing the construction of the tower. It obtained a ground lease from the fire department, conducted surveys and tests on the property, and submitted an application to the Federal Aviation Administration. The plaintiff then completed the special permit application and submitted it to the zoning commission. The application was submitted on behalf of the fire department, as it was the owner of the property. In support of the application, Burnaska submitted a letter on behalf of the town that stated: "[p]lease be advised that the town would be willing to [locate] its public safety communications systems on the tower, provided the town's needs and requirements will be met."

In the fall of 2001, the zoning commission held two public hearings to consider the special permit application. At the first meeting, Bellrock explained to the zoning commission that the plaintiff had only reserved space for the town and that "they may or may not choose to relocate on the tower." Furthermore, John Fallon, an attorney representing the fire department, but who was hired by the plaintiff, told the zoning commission that "[t]here is no agreement in place with the Police Department. They've made no representation about actually using the height, but the height has been reserved for their use." Finally, Daniel Tuba, the Monroe Town Planner, explained to the zoning commission that the town could not officially commit to locating on the tower because "whatever happens with the police communications at this point requires authorization through the Board of Finance, lease authorizations through the town council, and a number of other steps which have not been taken at this point." Upon the conclusion of the second public hearing, the zoning

commission voted to approve the application.

Shortly after the special permit application was approved, a contiguous landowner filed a timely appeal to the Superior Court, challenging the issuance of the special permit. The appeal process took more than two years, with the court denying the appeal in March, 2004. See *Hurley* v. *Monroe Planning & Zoning Commission*, Superior Court, judicial district of Fairfield, Docket No. CV-02-0389661 (March 8, 2004) (36 Conn. L. Rptr. 598).[5]

After the denial of the appeal, the plaintiff sought to begin construction of the communications tower. Bellrock sent an e-mail communication to Nunn, the town's first selectman at the time, requesting a meeting to "outline the town's position." Nunn responded by e-mail, stating that "at this time, the town will not need this tower to accommodate our police communications needs. The long waiting period forced us to pursue other avenues." Bellrock then sent a formal letter to Nunn requesting that the town "honor their commitment to locate on the tower." By that point, however, the town had abandoned its plan to locate on the plaintiff's tower and had decided to pursue other alternatives.

On April 5, 2006, the plaintiff filed this civil action against the town and Nunn. In the operative complaint, the plaintiff alleged three counts: breach of contract, promissory estoppel, and negligent misrepresentation. Following a trial, the jury returned a verdict in favor of the plaintiff on the first (breach of contract) and third counts (negligent misrepresentation), and a verdict in favor of the defendants on the second count (promissory estoppel). The jury awarded the plaintiff $700,000 in damages for count one and no additional damages for count three.[6] After receiving the jury verdict, the defendants filed a motion to set aside the verdict, which was denied by the court in February, 2013. This appeal followed. After the defendants filed a motion for articulation, the court issued a memorandum of decision on the motion to set aside the verdict in December, 2013.

On appeal, the defendants claim that the court erred in denying the motion to set aside the jury's verdict on the first and third counts. Specifically, the defendants claim that the jury's findings of a breach of contract and negligent misrepresentation were not supported by the evidence adduced at trial.

"The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion, and should not refuse

to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Embalmers' Supply Co.* v. *Giannitti*, 103 Conn. App. 20, 32–33, 929 A.2d 729, cert. denied, 284 Conn. 931, 934 A.2d 246 (2007).

I

The defendants first claim that the jury's finding that they breached a contract was not supported by the evidence and was contrary to law. The plaintiff contends that the evidence reasonably supported the conclusion that the parties entered into an express or implied contract. The defendants, on the other hand, argue that the plaintiff failed to present evidence which could reasonably support the jury's finding that there was a contract between the parties. We agree with the defendants.

We now set forth the applicable legal standard governing breach of contract claims involving municipalities. "A contract is an agreement between parties . . . . Contracts may be express or implied. . . . If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one. But if such agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one." (Internal quotation marks omitted.) *Boland* v. *Catalano*, 202 Conn. 333, 336–37, 521 A.2d 142 (1987). "To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists. . . . [A]n agreement must be definite and certain as to its terms and requirements. . . . So long as any essential matters are left open for further consideration, the contract is not complete." (Internal quotation marks omitted.) *Duplissie* v. *Devino*, 96 Conn. App. 673, 688, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006).

In breach of contract claims involving a municipality, the plaintiff has the additional burden of proving that the government official entering into the contract had the authority to do so. *Norwalk* v. *Board of Labor Relations*, 206 Conn. 449, 452, 538 A.2d 694 (1988) ("it follows that if the . . . agent had in fact no power to bind the municipality, there is no liability on the express contract" [internal quotation marks omitted]). This

power flows from the municipal charter. "It has been well established that a city's charter is the fountainhead of municipal powers . . . . The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. . . . Agents of a city . . . have no source of authority beyond the charter. . . . In construing a city charter, the rules of statutory construction generally apply. . . .

"The officer, body or board duly authorized must act [on] behalf of the municipality, otherwise a valid contract cannot be created. Generally the power to make contracts on behalf of the municipality rests in the council or governing body . . . . Generally, no officer or board, other than the common council, has power to bind the municipal corporation by contract, unless duly empowered by statute, the charter, or authority conferred by the common council, where the latter may so delegate its powers . . . . 10 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1990) § 29.15, p. 315. . . . It follows that agents of a city, including its commissions, have no source of authority beyond the charter. [T]heir powers are measured and limited by the express language in which authority is given or by the implication necessary to enable them to perform some duty cast upon them by express language. . . . All who contract with a municipal corporation are charged with notice of the extent of . . . the powers of municipal officers and agents with whom they contract, and hence it follows that if the . . . agent had in fact no power to bind the municipality, there is no liability on the express contract . . . . Thus, every person who deals with [a municipal corporation] is bound to know the extent of its authority and the limitations of its powers." (Citations omitted; internal quotation marks omitted.) *Fennell* v. *Hartford*, 238 Conn. 809, 813–14, 681 A.2d 934 (1996).

The town's charter establishes the organizational structure of the local government. This organizational structure divides power between a first selectman (executive branch) and a nine-person town council (legislative branch). The charter allocates specific powers and responsibilities to each branch. Among the powers and duties of the town council is "[t]he power to approve and authorize contracts to which the town is a party or in which the town has an interest." Charter of the Town of Monroe, ch. II, § 4. Among the powers and duties of the first selectman is the power to act as "the purchasing agent of the town," to make "recommendations to the Council for legislative action," and to attend "Council meetings with full right of participation in the discussion of the Council but without the right to vote." Charter of the Town of Monroe, ch. III, § 2.

In the present case, the plaintiff does not allege to have formed a contract with the town council,[7] but

rather alleges that a contract was formed with Burnaska, the first selectman at the time.[8] As Burnaska lacked direct authority to bind the town to a contract, the plaintiff bore the burden of establishing that the town council had delegated its contracting authority to Burnaska. As agency authority can be established both expressly and apparently, we consider each in turn.

A

We first turn to the defendants' claim that the jury's verdict was clearly erroneous because there was no evidence to substantiate a finding of express authority from the town council to the first selectman. The plaintiff argues that the jury could have reasonably concluded on the basis of the town council's actions that express authority had been provided. We disagree and conclude that the evidence is insufficient to support a finding of express authority.

"Agency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act . . . . Restatement (Second), 1 Agency § 1 [1958]. . . . Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." (Citation omitted; internal quotation marks omitted.) *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 132–33, 464 A.2d 6 (1983). "Moreover, it is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the [agency relationship]. . . . An agent's authority may be actual or apparent. . . . Actual authority may be express or implied. . . . Implied authority is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess. . . . Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent." (Citations omitted; internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 849–50, 817 A.2d 683 (2003). In present case, the plaintiff alleges that an oral agreement was reached at some time between March, 2001[9] and September, 2001.[10] We review the record to determine if, prior to the alleged agreement, the town council authorized Burnaska to contract on its behalf.

A review of the record and transcripts confirm that the plaintiff presented no evidence from which a jury reasonably could have found, or reasonably inferred, that express authority had been delegated from the town council to Burnaska. At trial, the plaintiff pre-

sented four witnesses: Bellrock, Burnaska, Nunn, and Marc Gottesdiener,[11] who testified only on the issue of damages. Burnaska was the first selectman at the time of the purported agreement. She testified that as first selectman, she had the power to recommend that the town council enter into a contract, but did not have the power to enter into a contract for the town unilaterally.[12] Furthermore, she testified that she never actually promised Bellrock that the town would locate on the proposed tower.[13] Nunn, who later became first selectman, was on the town council at the time the alleged agreement took place. He testified that First Selectman Burnaska had no authority to enter into a contract on behalf of the town. Nunn testified that, as a member of the town council, he was present at the meeting that authorized Burnaska to contact the fire department to initiate discussions about locating on the proposed tower. He testified that, although the plaintiff's proposal had strong support among town officials, any contractual agreement would require the holding of a town meeting to address any concerns, as well as formal approval from the town council and the board of finance. Burnaska and Nunn never testified that the town council had delegated the authority to contract to Burnaska.

Bellrock also testified at trial, but was unable to provide any testimony that could allow for a reasonable inference that actual authority had been given to Burnaska as first selectman. Bellrock testified that he dealt exclusively with members of the town's executive branch. He initially met with Sherwood Lovejoy, the town engineer and director of public works for the town. He later had several meetings with Burnaska. Under the town charter, neither of these individuals had the power to enter into a contract on behalf of the town. Furthermore, Bellrock testified that on two occasions, the town council did expressly authorize Burnaska to act. In April, 2001, Burnaska was authorized to begin initial discussions and negotiations with the fire department regarding the locating of communication equipment on the proposed tower. Secondly, in July, 2001, the town council authorized Burnaska to send a letter to the fire department president notifying him that the town was willing to "co-locate its public safety communications system on the tower provided the town's needs and requirements will be met." Bellrock never testified, however, that the town council had delegated its powers to Burnaska in any of her dealings with Bellrock. As a result, there is nothing in the trial transcript that supports a finding that Burnaska had actual authority, either express or implied, to enter into a contract on behalf of the town.

Finally, a thorough review of the trial exhibits reveals no evidence from which a reasonable inference could be made that Burnaska had been given the power to contract. In fact, the evidence tends to suggest just the

opposite. In two separate instances, the town council authorized Burnaska to pursue initial discussions regarding the plaintiff's tower. In each instance, Burnaska officially requested authorization in writing, the town council responded in writing, and the authorization was voted on at a town meeting and was recorded in the town meeting minutes. This evidence strongly suggests that if Burnaska had been given express authority to contract on behalf of the town, then that authorization would have been readily available in the public records.

The plaintiff alleged a breach of agreement by the town, but claimed that the agreement was made with the first selectman and not the town council. As the town charter does not empower the first selectman to authorize contracts on behalf of the town, the plaintiff was required to present evidence showing the existence of an express or implied[14] agency relationship between the town council and the first selectman. As there was no evidence presented indicating a delegation of authority, we find any jury verdict that relies on such a finding to be based on pure speculation. See *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 419, 880 A.2d 882 (2005).

B

In light of the general verdict in this case,[15] we must now address the possibility that the jury found that Burnaska had apparent authority to enter into a contract. At trial, the court expressly instructed the jury that it could find that a contract had been formed if Burnaska had either express or apparent authority.[16] On appeal, the defendants argue that principles of municipal law do not allow for a claim of apparent authority. We agree.

Under municipal law, the plaintiff is charged with constructive knowledge of the extent and limitations of the powers of municipal officers. *Fennell* v. *Hartford*, supra, 238 Conn. 814. Thus, the plaintiff was charged with the knowledge that the town council held the power to contract on behalf of the town. The law also charged the plaintiff with the knowledge that the first selectman did not have such authority and was thus, limited to making recommendations to the council.

"Apparent authority is th[e] semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses." (Internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 508, 4 A.3d 288 (2010). It logically follows that, when charged with *knowledge* of a municipal officer's actual power, a party cannot then argue that they *believed* the officer's power to be something different. We therefore conclude that claims of apparent authority are inconsistent with established municipal law and

cannot logically form the basis of a valid municipal contract. To the extent the jury's general verdict was based on apparent authority, we find it to be clearly erroneous.

Although our state courts have not previously rejected the doctrine of apparent authority in the municipal contract setting,[17] we find broad support for the proposition in federal and state law. It is a well established principle in federal law that the United States government cannot be held liable for claims of apparent authority or estoppel. See *Federal Crop Ins. Corp.* v. *Merrill*, 332 U.S. 380, 383, 68 S. Ct. 1, 92 L. Ed. 10 (1947) (holding that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority . . . [a]nd this is so even though . . . the agent himself may have been unaware of the limitations upon his authority"); *United States* v. *Flemmi*, 225 F.3d 78, 85 (1st Cir. 2000) ("[a]s a general rule, doctrines such as estoppel and apparent authority are not available to bind the federal sovereign"), cert. denied, 531 U.S. 1170, 121 S. Ct. 1137, 148 L. Ed. 2d 1002 (2001); *Ferguson* v. *Fed. Deposit Ins. Corp.*, 164 F.3d 894, 898 (5th Cir.) ("the Government is not bound by the actions of agents acting outside the scope of their authority"), cert. denied, 528 U.S. 819, 120 S. Ct. 61, 145 L. Ed. 2d 53 (1999); *Hachikian* v. *Fed. Deposit Ins. Corp.*, 96 F.3d 502, 505–506 (1st Cir. 1996) ("apparent authority cannot serve as a means of holding the federal sovereign to a contract"); *Thomas* v. *Immigration & Naturalization Service*, 35 F.3d 1332, 1338 (9th Cir. 1994) ("[e]stoppel and apparent authority normally will not substitute for actual authority to bind the United States government").

Furthermore, many of our sister states have also rejected claims of apparent authority in the context of municipal contracts. See *Dagastino* v. *Commissioner of Correction*, 52 Mass. App. 456, 458, 754 N.E.2d 150 (2001) ("[i]n short, the doctrine of apparent authority does not apply to the government, its agencies, or its officials"); *Sinclair* v. *Bow*, 125 N.H. 388, 391–92, 480 A.2d 173 (1984) (holding local governments as excluded from application of doctrine of apparent authority); *Zanesville* v. *Mohawk Data Sciences Corp.*, 97 App. Div. 2d 64, 66, 468 N.Y.S.2d 271 (1983) ("[t]hose dealing with officers or agents of municipal corporations must at their peril see to it that such officers or agents are acting within their authority . . . and they have no right to presume the persons with who they are dealing are acting within the line of their authority" [citation omitted]); *Casa DiMario, Inc.* v. *Richardson*, 763 A.2d 607, 610 (R.I. 2000) (rejecting claim of apparent authority on basis that " 'the authority of a public agent to bind a municipality must be actual' "); but see *Wiggins* v. *Barrett & Associates, Inc.*, 295 Or. 679, 692, 669 P.2d 1132 (1983) (allowing application of doctrines of appar-

ent authority and estoppel in municipal contracts).[18] We are persuaded by the broad support for this proposition.

The aforementioned applicable principle, as well as a review of the well reasoned decisions of the federal courts and the courts of our sister states, compel the conclusion that a party charged with knowledge of a government official's actual authority cannot assert a belief that the official's authority was something greater. We therefore conclude that the doctrine of apparent authority is inapplicable in the context of a municipal contract.

C

Lastly, we recognize that "a municipality may become bound to an agreement, despite its agent's lack of authority, by a subsequent ratification of the agreement." *Norwalk* v. *Board of Labor Relations*, supra, 206 Conn. 453. A municipality ratifies an otherwise invalid contract when it later accepts the benefits of the contract. *Pepe* v. *New Britain*, 203 Conn. 281, 294, 524 A.2d 629 (1987). We now consider whether the record supports a finding that a contract was formed by way of ratification.

In reviewing the record, we find no evidence that the town council acted in any way that could reasonably be interpreted as ratification of the agreement.[19] The town never accepted or received any benefit from the purported agreement. Bellrock acknowledged at trial that the plaintiff would build, own and operate the tower itself. He also stated that the plaintiff would lease the land directly from the fire department. Although the plaintiff led efforts to obtain the special permit, including defending an appeal in Superior Court, the named permit applicant was the fire department. Thus, the town would receive no tangible benefit from the alleged agreement until the communications tower was built and space was made available for its communications equipment. As the tower was never built, there was no benefit received by the town and, therefore, no basis to support a finding of ratification.

II

The defendants also claim on appeal that the court erred in denying the motion to set aside the verdict with respect to the count of negligent misrepresentation. Specifically, the defendants claim that the jury's verdict in favor of the plaintiff on the claim of negligent misrepresentation was against the evidence because the plaintiff did not prove the existence of a false statement. We agree.

"Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact. . . . [Our Supreme Court] has long recognized liability for negligent misrepresentation. . . . The governing principles are set forth in . . . § 552 of the Restatement Second of Torts [1977]: One who, in the course of his

business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. . . . [T]he plaintiff need not prove that the representations made by the [defendants] were promissory. It is sufficient . . . that the representations contained false information. . . . There must be a justifiable *reliance* on the misrepresentation for a plaintiff to recover damages." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Mips* v. *Becon, Inc.*, 70 Conn. App. 556, 558, 799 A.2d 1093 (2002).

At the conclusion of trial, the jury returned a verdict in favor of the plaintiff on the count of negligent misrepresentation, but did not enter a separate award on that count because the alleged damages were the same as the claim for breach of contract. As a result, we must determine whether the record supports the jury's finding of negligent misrepresentation by the defendants.

In denying the defendants' motion to set aside the verdict, the court stated that the jury's verdict was properly supported by evidence that the town, through Burnaska, made a false statement when she stated that it would place its communications equipment on the plaintiff's tower. The court cited Burnaska's statement to the Connecticut Siting Council, in which she stated "[i]f this tower application is approved, and it meets the needs of the town, the town of Monroe will locate its public safety communications on it." The plaintiff argued, and the court agreed, that because the town did not ultimately decide to locate its equipment on the plaintiff's tower, this statement was false and consequently could support a claim of negligent misrepresentation.

This analysis incorrectly applies the legal standard, however. The correct standard is whether Burnaska knew, or should have known, her statements were untrue *at the time they were made*. See *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 74 n.32, 873 A.2d 929 (2005) (noting general rule that misrepresentation must relate to existing or past fact); see also *Barry* v. *Posi-Seal International, Inc.*, 36 Conn. App. 1, 21, 647 A.2d 1031 (1994), remanded for further reconsideration, 235 Conn. 901, 664 A.2d 1124 (1995). It is not enough to simply present evidence of a statement of present intention that, in retrospect, did not come to fruition. Rather, the plaintiff must present evidence that indicates the statement was false when made.[20]

On our careful review of the record, we find no evidence to support the claim that Burnaska knew, or had reason to know, her statements were false at the time she made them. First, her statements must be consid-

ered within the context of the surrounding facts and circumstances. Bellrock testified that he would pursue the permit, lease the land, build the tower, and then earn income by renting out space to private cell phone carriers. Bellrock wanted to avoid having to apply for a permit through the Connecticut Siting Council and, therefore, needed the town's commitment to locate the communication equipment on the tower. As the town was interested in the plaintiff's plan and was hopeful it would receive zoning approval, it authorized Burnaska to send a letter to the zoning commission expressing its intention to locate on the tower. The town also authorized Burnaska to express the town's intention to the fire department, who was the named applicant on the special permit application. There is no evidence in the record that even remotely suggests that Burnaska, or any other town official, knew or should have known these statements were not true at that time. In fact, all of the evidence indicates that the town fully intended to locate on the plaintiff's tower. The town's ad hoc committee had recommended the fire department location as a viable site for the tower. Burnaska and Nunn testified that, at the time of the statements, they both believed that the tower was the best possible solution to the town's safety communication problems. Furthermore, Nunn testified that in 2003, several years after the statement was made, the town council was still requesting updates on the status of the permit application, indicating a continued interest in the plaintiff's plan. Nunn also testified that the town did not consider alternative solutions until the winter of 2003 to 2004.

In conclusion, Burnaska's statement constituted one of present intention to act in the future. The town's later decision, based on new facts and circumstances, to take action inconsistent with that intention does not automatically render the original statement false. The plaintiff was required to show evidence that indicated Burnaska's statements were knowingly false or could have been found to be false through acts of reasonable care. All of the evidence suggests that the statements were truthful: the town was strongly interested in the plaintiff's proposal and made every effort to facilitate the building of the communications tower. As a result, we must conclude that the court abused its discretion when it denied the defendants' motion to set aside the verdict on the claim of negligent misrepresentation.

As the record in this case is insufficient to support a finding of breach of contract or negligent misrepresentation, we must conclude that the court abused its discretion in denying the defendants' motion to set aside the verdict. In doing so, we recognize the tremendous deference given to both the findings made by the trier of fact, as well as the judgment of trial court. In this case, however, even when we review the evidence in the light most favorable to sustaining the verdict, the plaintiff has not provided any evidence that could rea-

sonably support, through inference or otherwise, the jury's findings of a breach of contract or negligent misrepresentation by the defendants. Because the jury's findings were clearly erroneous, we therefore conclude that the court abused its discretion in denying the defendants' motion to set aside the verdict.

The judgment is reversed and the case is remanded with direction to grant the defendants' motion to set aside the verdict and to render judgment for the defendants.

In this opinion the other judges concurred.

[1] Andrew J. Nunn was the first selectman of the town from December, 2001, until 2007. The plaintiff, Bellsite Development, LLC, named Nunn as a defendant in his official capacity only.

[2] Karen Burnaska served as the town's first selectman from December, 1995, until December, 2001.

[3] At trial, Bellrock testified that "[w]hat I took from that was that rather than [the town] incurring the cost and the risk, and part of the cost is hiring someone like me to do the application, that I would step in their shoes, and I would ground lease the property, and I would submit the application, and I would take the risk of getting it approved."

[4] At trial, Bellrock testified to the following:

"[The plaintiff's counsel]: It says there was a recent ruling of the U.S. District Court—do you see that section?

"[Bellrock]: Yes. Yup.

"[The plaintiff's counsel]: Jurisdiction over municipal public safety equipment, including towers, remains under the municipal control of planning and zoning; do you see that?

"[Bellrock]: Yes . . . the [decision] clarified . . . that municipal towers . . . did not have to go to the state siting council. . . .

"[The plaintiff's counsel]: And what is the significance of that? . . .

"[Bellrock]: I would not have done a state siting council application."

[5] In its memorandum of decision, the court stated that the record "establishes that the tower will be used for emergency communications by the [Monroe Volunteer Fire Department] and, *potentially, by the Monroe Police Department.*" (Emphasis added.) *Hurley* v. *Monroe Planning & Zoning Commission*, supra, 36 Conn. L. Rptr. 599.

[6] The jury was instructed by the court that if they were to award damages under counts one or two, then they could not also award separate damages on count three. Accordingly, although the jury found for the plaintiff on count three, no separate damages were awarded.

[7] During the trial, the plaintiff testified that he did not have an express agreement with the town council.

"[The defendants' counsel]: So at that point, if not earlier, you knew that there had to be some sort of formal process before the police could actually— or the town, on behalf of the police, could actually enter into a contract with you, right?

"[Bellrock]: No.

"[The defendants' counsel]: Okay. But, in fact, as of September of—as of 2001, none of the steps that the town planner describes had taken place, had they?

"[Bellrock]: They've never taken place."

[8] The plaintiff's counsel stated, at closing argument: "Now, the town says that there was no agreement. There was an agreement. We have evidence in the record of an oral agreement between Karen Burnaska and Bill Bellrock with regard to this."

[9] The town council held a meeting on February 26, 2001, to discuss potential locations for the police communication equipment. At trial, Bellrock testified that at that time he "still didn't have a contract with them or a consulting contract with them." Bellrock also testified that the agreement was reached after a crane test, scheduled for April 5th and 6th of 2001.

[10] By September, 2001, the zoning commission held a hearing on the special permit application to build the communications tower at the fire department.

[11] Gottesdiener testified that he was a certified general appraiser and licensed real estate agent and broker. He testified specifically as to the appraised value of the plaintiff's proposed communications tower and the potential revenue stream that could have been derived from it.

[12] On direct examination, the following exchange took place:

"[The plaintiff's counsel]: But if you said the town will go on the tower, that would be different?

"[Burnaska]: Well, I had no authority to say the town would go on the tower.

"[The plaintiff's counsel]: All right.

"[Burnaska]: I could not make that statement on my own, and there was a lot of other information that was needed before a statement like that could be made."

[13] At trial, the following exchange took place:

"[The defendants' counsel]: Do you have a specific recollection of not promising, contracting, assuring [Bellrock] that the town would locate contractually with an intent to be bound, locate on a tower that he was going to build?

"[Burnaska]: I never said that and it never happened."

[14] "The existence of an implied agency is essentially a question of fact. . . . The proof is generally found in the acts and conduct of the parties." (Citation omitted.) *Cleaveland* v. *Gabriel*, 149 Conn. 388, 394, 180 A.2d 749 (1962).

[15] The jury in this case rendered a general verdict and was not provided any interrogatories. Typically in situations such as this we would apply the general verdict rule. The rule states that "if a jury renders a general verdict for one party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party." (Internal quotation marks omitted.) *Fabrizio* v. *Glaser*, 38 Conn. App. 458, 461, 661 A.2d 126 (1995) aff'd, 237 Conn. 25, 675 A.2d 844 (1996). In this case, however, the trial court stated in its memorandum of decision that the defendants did, in fact, request interrogatories but "ultimately did not press this request." The defendants stated in their appellate brief that the court refused to allow interrogatories unless both parties could reach an agreement on the specific language that would be presented to the jury. Although the issue has not been raised on appeal, we recognize the inherent unfairness in imposing the general verdict rule on a party that has requested, but was denied, an opportunity to submit interrogatories to the jury. See *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993) ("[a] party desiring to avoid the effects of the general verdict rule may elicit the specific grounds for the verdict by submitting interrogatories to the jury").

[16] The court provided, in part, the following jury instruction on the issue of apparent authority: "Now, in order for you to find the defendant liable on this theory, you must find that the defendant had either express authority, as I previously instructed you, or apparent authority, and now I want to tell you about apparent authority. . . .

"There is a distinction, however, between the concept of agency and the separate question or consideration as to whether at the times pertinent to the plaintiff's complaint, Karen Burnaska, as an agent of the Town of Monroe, was acting with the authority required to bind her principal, either by virtue of apparent or actual authority—or express—I don't mean to switch language on you—either by virtue of apparent or express authority."

[17] Our Supreme Court did acknowledge the limitation of apparent authority in the municipal context in *Norwalk* v. *Board of Labor Relations*, supra, 206 Conn. 452 ("[t]he parameters of [the apparent authority] doctrine . . . are sharply circumscribed when the principal is a municipal corporation"). Our Supreme Court also dealt with an apparent authority claim in *John J. Brennan Construction Corporation Inc.* v. *Shelton*, 187 Conn. 695, 708–710, 448 A.2d 180 (1982), but chose to resolve the case on other grounds. In that case, the court rejected the apparent authority claim on the grounds that the trial court made no such specific finding and neither party had requested an articulation on the matter. Id.

[18] The Supreme Court of Oregon in *Wiggins* stated the reason for allowing the apparent authority or estoppel doctrines in the municipal context is to "to prevent unjust enrichment and to accord fairness to those who bargain with the agents of municipalities for the promises of the municipalities." *Wiggins* v. *Barrett & Associates, Inc.*, supra, 295 Or. 692. The court in *Wiggins* cited several Oregon cases going back to 1903, where the doctrines were applied to government parties. Id., 693. In contrast, our state does not have such a history of allowing the application of these doctrines in municipal cases. As a result, we find the reasoning in *Wiggins* to be particularly unpersuasive.

[19] We note that the trial court explicitly found that the plaintiff presented "no evidence of formal ratification of the agreement between the parties by the town council."

[20] This evidence may include subsequent conduct indicating the declarant

knew or should have known the falsity of the statement. *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 76.

———————————————